**Leah N. BISHOP, on her own behalf and on behalf of all others similarly situated, namely, qualified voters wishing to register to vote in the forthcoming presidential election during the month of September, et al., Plaintiffs,**

v.

**John P. LOMENZO, Secretary of State of the State of New York, et al., Defendants.**

No. 72 Civ. 1088.

United States District Court, E. D. New York.

Sept. 7, 1972.

---

Burt Neuborne, Arthur Eisenberg, Mervin Rosenman, New York City, for plaintiffs.

Louis J. Lefkowitz, Atty. Gen. of New York, New York City, for defendants Rockefeller and Lomenzo; George D. Zuckerman, Asst. Atty. Gen., of counsel.

Joseph Jaspan, County Atty., Nassau County, Mineola, N. Y., for defendants Meisser and Cristenfeld; J. Kemp Hannon, Mineola, N. Y., of counsel.

Norman Redlich, Corp. Counsel, New York City, for defendants Dinkins, Martinez, Duberstein and Larkin; Elliot P. Hoffman, Asst. Corp. Counsel, of counsel.

Before MANSFIELD, Circuit Judge, and BARTELS and DOOLING, District Judges.

MANSFIELD, Circuit Judge.

This suit, instituted under the federal civil rights law, 42 U.S.C. § 1983, asks us to declare § 355 of the New York Election Law,[1] McKinney's Consol.Laws,

---

1. N. Y. Election Law § 355:

"§ 355. *Central registration*

"Any qualified person may register at the main office of the board of elections or any branch office thereof at any time during the hours that such office is regularly open for business, or at any other time which the board of elections in its discretion may permit, on any day which is not a Sunday, holiday or day of election and does not lie within thirty days immediately before the first day of local registration and thirty days immediately after the general election, or within ten days immediately before and five days immediately after any other election held pursuant to the provisions of this chapter in the election district in which the applicant resides; provided, however, that in the first year in which permanent personal registration is in effect, such registrations shall be received only during the period commencing on the first day of May and

continuing through the thirty-first day immediately preceding the first day of local registration. Notwithstanding any inconsistent provision of this charter, any qualified person who has changed his residence within the county or within the city of New York within the period following the last day of local registration and ten days before the day of a general election may register centrally on any day after the last day of local registration which is not a Sunday, holiday or day of election and does not lie within the period of ten days before the day of the general election. The board of elections shall keep its office open to receive registrations at all such times and shall, at all such times, keep in attendance at least two members or employees of the board authorized by the board to receive registrations, one such member or employee representing each of the two political parties which, at the last preceding election for governor, cast the

c. 17 unconstitutional and to enjoin its enforcement, when read with § 354,[2] § 355 would have the effect of barring registration of qualified voters during a period of approximately 66 days prior to the Presidential election to be held on November 7, 1972, except for local registration during a few days in the first part of October (October 5, 6, 7 and 10) and for absentee registration as authorized by § 153-a[3] of the Election Law. In addition, plaintiffs ask us to enjoin as unconstitutional certain other provisions of the New York Election Law (§§ 39 through 42, and § 353) to the extent that they restrict qualified registrars of voters to teams consisting of one enrolled member of each of the two major political parties (Democratic and Republican) and preclude others, including independent voters, members of other parties (Liberals and Conservatives) and persons who have registered since the last preceding general election, from serving as registrars.

Since the complaint raised substantial questions with respect to the constitutionality of statutes of state-wide appli-

highest and the next highest number of votes. Any two such members or employees representing the two parties aforesaid shall constitute a central board of registration for the receipt of registrations. In the city of New York the board of elections, with the approval of the city council of the city of New York, may provide branch offices of the central registration board in any county of such city. Outside the city of New York the board of elections, with the approval of the board of supervisors of any county, may provide branch offices of the central registration board in any city, town or village." (McKinney Supp. 1971-72).

2. Section 354 provides in pertinent part:
"§ 354. *Meetings for local registration*

\*      \*      \*      \*      \*

"2. The board of inspectors for every election district shall meet for the purpose of taking the registration of voters not earlier than the sixth Saturday or later than the fourth Saturday before each general election. During such period, in the city of New York and in counties having a population of three hundred thousand or more, the board shall hold three meetings each year, including at least one Saturday except that in years in which a president of the United States is to be elected, the board shall hold four such meetings, including at least one Saturday. During such period, in all other counties, the board shall hold two meetings each year, including at least one Saturday except that in years in which a president of the United States is to be elected, the board shall hold three such meetings, including at least one Saturday. The dates of such meetings and any other additional meetings that the board of elections may, in its discretion, direct to be held shall be determined by the board of elections. The board of elections shall also determine the hours for conducting all such meetings, provided, however, that there shall be not less than ten consecutive hours for registration on a Saturday and not less than five consecutive hours on any other meeting day. The days and hours of registration shall be uniform throughout the county and in the city of New York throughout the city, and meetings shall begin not earlier than six o'clock in the morning and continue not later than half-past ten o'clock in the evening."

3. Section 153-a provides in pertinent part:
"§ 153-a. *Absentee registration by voters who are ill or physically disabled, or whose duties, occupation or business require them to be outside the county of residence, or if a resident of the city of New York, outside said city*

"1. A voter residing in an election district in which the registration is required to be personal or in an election district in a county or city in which permanent personal registration is in effect, and who is unable to appear personally for registration because he is confined at home or in a hospital or institution, other than a mental institution because of illness or physical disability or because his duties, occupation or business require him to be outside the county of residence, or if a resident of the city of New York, outside said city, on such days, may be registered in the manner provided by this section. A voter residing in an election district in which personal registration is not required may file an application for absentee registration in accordance with the provisions of this section and also may be registered in the manner otherwise provided by law."
(N.Y. Election Law § 153-a (McKinney Supp. 1971-72))

cation, we were, on August 23, 1972, designated to serve as a statutory three-judge district court by the Acting Chief Judge of the United States Court of Appeals for the Second Circuit pursuant to 28 U.S.C. §§ 2281 and 2284. Following the service and filing by the defendants of answers and motions to dismiss the complaint pursuant to Rule 12(b), F.R.Civ.P., on various grounds (laches, defective papers, lack of standing, lack of jurisdiction over the subject matter and failure to state a claim for relief), we, on August 30, 1972, held a hearing at which testimony, documentary evidence, and stipulated proof were received.

Concluding that we had jurisdiction over the subject matter, which had been invoked pursuant to 42 U.S.C. § 1983, 28 U.S.C. §§ 1343 and 2201, et seq., we, on August 31, 1972, issued a temporary restraining order directing the defendants, among other things, to continue central registration of voters in accordance with the procedures provided by § 355 of the New York Election Law, until September 15, 1972, or until the filing of our decision, whichever event should first occur.

Plaintiff Leah N. Bishop, a Nassau County resident recently enfranchised by the Twenty-Sixth Amendment, will be able to register personally only during a period of approximately two weeks in September, as she is employed and attends school in Massachusetts. The other plaintiffs are individuals and organizations desiring to engage in volunteer registration activities during September in connection with the forthcoming Presidential election. Except for plaintiff Alan Epstein, an enrolled Democrat, none of the individual plaintiffs is enrolled as Democrat or Republican.

Upon learning of defendants' proposal to enforce the above-mentioned provisions of the Election Law, plaintiffs, frustrated in their plans to continue their registration activities in September, instituted the present purported class suit on August 17, 1972, on behalf of themselves and all others similarly situated. They claim that the provisions of § 355, which mandate the termination of central registration of voters for a period of 30 days prior to local registration, i. e., from September 2, 1972 (since September 3 and 4 fall on Sunday and Labor Day, respectively) to October 5, 1972, will have the effect of disenfranchising large numbers of the electorate who are qualified to participate in the forthcoming Presidential election, in violation of the First, Fourteenth, Fifteenth and Twenty-Sixth Amendments to the United States Constitution and the Voting Rights Act Amendments of 1970, § 202(d), 42 U.S.C. § 1973aa–1(d) (the "Act" herein). They further assert that the New York statutory provisions restricting registrars to enrolled members of the two major political parties and requiring that registration be conducted by teams of one member each of these two parties discriminate against plaintiffs and others who wish to act as registrars and violate their rights under the same provisions of the Constitution.

Defendants are the Governor and Secretary of State of New York and the Commissioners of Election of Nassau County and of the City of New York. Although David N. Dinkins, Commissioner of Elections for New York City and Marvin D. Cristenfeld, Commissioner for Nassau County, are named as defendants, they not only do not oppose the relief sought but have appeared and testified in favor of it. Counsel for the New York City Board of Elections filed an affidavit to the effect that it takes no position on the merits of the action but will abide by any order of this Court affecting the validity of the statutes under attack. The Commissioner of Elections of Rockland County filed an affidavit generally favoring the continuation of central registration of voters during September 1972. All defendants other than Dinkins and Cristenfeld, however, oppose the suit and seek its dismissal. Defense counsel, furthermore, offered to furnish testimony of commissioners of elections from other coun-

ties of New York oppposing continuation of registration in September.[4]

At the outset we face certain threshold questions, the first of which is the contention that equitable relief should be denied because of laches. Unquestionably plaintiffs, who have been actively engaged in registration activities as early as mid-July, were or should have been aware of the general provisions of the statutes now under attack. Their delay in bringing suit until August 17, 1972, has imposed a heavy burden not only on the Court but on the defendants who, if the action had been commenced earlier, would have been afforded more time to prepare for any contingency, e. g., to explore the issues and to prepare the administrative and clerical force required to continue registration activities in September, if it should be so ordered. In reply plaintiffs urge that they believed until they were first advised to the contrary in mid-August that they would be permitted to continue their activities (i. e., registration by voluntary unpaid registrars) in September since they were not using the services of regular paid employees of the Boards of Elections and hence did not consider their activities to be "Central Registration" as that term is used in § 355. While we do not doubt plaintiffs' good faith, it is apparent that the New York City Board of Elections, in permitting unpaid volunteers to function as registrars, was acting pursuant to authority granted by § 355 to provide "branch offices of the central registration board in any county" and plaintiffs could have clarified the matter by asking the boards for their view at an earlier date. However, in view of our conclusion that § 355 does violate the Voting Rights Act Amendments of 1970—a violation which could, unless restrained, affect the rights of thousands of qualified voters—we believe that the public interest in enforcement of such an important federal law is paramount and should not be defeated because of laches on the part of the named plaintiffs. Any inability due to the short notice, to provide the clerical or administrative assistance required to comply fully with the Act, although relevant to determination of the nature and extent of the relief to be granted, would not provide a basis for denial of any relief at all.

Turning to the question of plaintiffs' standing, we are satisfied that plaintiffs have a sufficient personal stake in the outcome and are seriously enough affected by the enforcement of the statutes in question to insure presentation of the issues in an adversary context that is capable of judicial resolution as a case or controversy within the meaning of Article III, § 2 of the Constitution. See Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663; Flast v. Cohen, 392 U.S. 83, 101; Abele v. Markle, 452 F.2d 1121, 1124–1125 (2d Cir. 1971). Plaintiffs here have far more than an academic interest of the type found insufficient in Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). Except for Ms. Bishop, who desires to register in September, they are now all currently engaged in registration activity, either as registrars or as organizations promoting such ends, and if they prevail in this lawsuit, they propose to continue these activities. Lastly, if plaintiffs were denied standing, it is difficult to conceive of any person who would have standing.

With respect to plaintiffs' application for a determination that the action may be maintained as a class action pursuant to Rule 23, F.R.Civ.P., it appears from the evidence that there are

---

4. Despite the dissidence of some defendants and the Rockland County affidavit supporting plaintiffs' position, we are satisfied that the interests of defendants opposing the suit have been ably and adequately represented. Furthermore, while vigorously opposing the suit on the merits, they have cooperated in efforts to save the time of the Court and of the parties by stipulating certain facts and agreeing that if called, certain witnesses would give testimony as outlined by plaintiffs' counsel.

at least several thousand voluntary unpaid registrars having the same interests as the named plaintiffs and that there are probably thousands of qualified voters who would register if afforded the opportunity in September but would probably not do so during the few days scheduled for local registration in October. In addition to the numerosity of the members, which renders joinder impractical, it further appears that there are questions of law and fact common to all members, that the claims are typical of those of other members, and that the named plaintiffs will fairly and adequately protect the interests of the class. Accordingly we conclude that the prerequisites prescribed by Rule 23 have been met for prosecution of the action on behalf of the members as a class.

■ Turning to the merits, we first consider the claim that § 355 violates § 202 of the Act, 42 U.S.C. § 1973aa–1, to which it must give way under the Supremacy Clause of the Constitution. Although "Supremacy Clause cases are not within the purview of § 2281," Swift & Co. v. Wickham, 382 U.S. 111, 122, 86 S.Ct. 258, 265, 15 L.Ed.2d 194 (1965), and constitutional claims of substance under the First, Fourteenth and other Amendments formed the basis for convening this three-judge court, Florida Lime and Avocado Growers, Inc. v. Jacobsen, 362 U.S. 73, 80 S.Ct. 568, 4 L.Ed. 2d 568 (1960), we have been instructed that where a case can be disposed of by a three-judge court through adjudication of a statutory or Supremacy Act claim, it should adjudicate that claim in preference to making a constitutional ruling. Rosado v. Wyman, 397 U.S. 397, 402–403, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970); Wyman v. Rothstein, 398 U.S. 275, 90 S.Ct. 1582, 26 L.Ed.2d 218

(1970); Ashwander v. Tennessee Valley Authority, 297 U.S. 288 (Brandeis, J., concurring), pp. 346–348, 56 S.Ct. 466, 80 L.Ed. 688 (1936); Peters v. Hobby, 349 U.S. 331, 75 S.Ct. 790, 99 L.Ed. 1129 (1955). Since in our view the present case lends itself to such an adjudication, we proceed accordingly.

To understand the purpose and effect of those provisions of the Act which, in our view, govern the present case, knowledge of certain background facts is essential. In recent years all three branches of our federal Government have been concerned about the non-participation of qualified electors in national elections.[5] This lack of participation has been attributed largely to state laws restricting voters' eligibility or access to the polls. In the 1968 Presidential election, for instance, although 89.4% of the nation's registered electorate went to the polls, those voting represented only approximately 60.6% of the nation's qualified persons of voting age. Hearings before the Committee on Post Office and Civil Service Voter Registration, 92nd Cong., 1st Sess. on S. 1199, S. 2445, S. 2457, and S. 2574 (1971) (the "McGee Hearings"), p. 93. This non-participation is due in large measure to the fact that many millions of qualified voters failed to register. On the basis of census figures it is estimated that approximately 47 million qualified persons of voting age will be ineligible to participate in the 1972 election due to their failure to register.

The failure of qualified persons of voting age to register is more serious in New York than nationally. The percentage of participation by eligible New York State electors in the 1968 election was less than the national figure of 60.6%. In New York, Bronx, and Kings

5. See, e. g., Civil Rights Act of 1960, 42 U.S.C. § 1971; Voting Rights Act of 1965, 42 U.S.C. § 1973; Harper v. Virginia Board of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966) (poll tax); Carrington v. Rash, 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965) (state denial of vote to military personnel); Dunn v. Blumstein, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972) (durational residency requirement); Evans v. Cornman, 398 U.S. 419, 90 S.Ct. 1752, 26 L.Ed.2d 370 (1970) (state denial of vote to residents of federal reservation); Presidential Proclamation of National Voter Registration Month, P.L. # 92–350 (Sept. 1972).

Counties, for instance, less than 50% of the eligible electors voted in 1968.

It is unchallenged, and hardly needs mention, that there is a correlation between the number of persons who register and the number who vote. The record of national elections reveals that the great majority of Americans who do register will vote. If more people register, therefore, more will vote. It is equally axiomatic that the greater the opportunity to register during periods when voter interest in a forthcoming election is highest the greater will be the number of qualified electors who will register. Lastly, it is clear that as a major political campaign "heats up," or captures the attention of the electorate in any community, the greater will be the demand on the part of the populace to register. Indeed, this has been the rationale behind the efforts of nonpartisan organizations, such as the League of Women Voters, to promote voter registration through such slogans as "If you do not register, you cannot vote in November." [6]

Although the percentage figures may vary from community to community, it is undisputed that the foregoing observations may properly be applied to registration of voters in New York. For instance, defendants do not question the fact that if the present system of registration were continued through September 1972, a substantially greater number of qualified electors would register and vote in the November election than if registration were restricted as required by § 355. Although local registration will be made available for four days in early October, many voters who would register in September would for one reason or another fail to register on those days. The latter phenomenon may be attributed to such factors as oversight, lack of motivation, lethargy, low literacy, or unexpected absence from the county of residence on those four dates. Although absentee registration is made available by § 153–a of the Election Law to those who are out of the city at times when the opportunity to register is afforded, the absentee regis-

6. For a learned treatise which reflects a detailed and in-depth study of the relationship between registration and voter turnout in elections, and between registration and variables such as residential requirements, times and places of registration, and socio-economic factors (age, education, income, race, etc.), see "Registration and Voting, Putting First Things First," 61 American Political Science Review 359 (1967). The authors found:

*"Registration Related to Turnout.* Our findings with respect to the first of the two major questions in which we were interested—that concerning the relationship of registration to the turnout of voters in elections—can be reported in a few sentences. In the full sample of cities, 78 percent of the variation in the percentage of the population of voting age that voted could be accounted for by variations in the percentage of the population of voting age that was registered to vote. As one would expect, the relationship was almost one-to-one; that is, if the percentage of the population of voting age registered to vote in City A was one percent higher than in City B, then the percentage of the population of voting age actually voting in City A was, on the average, almost exactly one percent higher than in City B. Moreover, it seems clear that registration requirements are a more effective deterrent to voting than anything that normally operates to deter citizens from voting once they have registered, at least in presidential elections. (p. 362) [Footnotes omitted]

\* \* \* \* \*

"A more striking finding is the extremely strong relationship between the date at which registration rolls are closed and the percentage of the population of voting age that is registered. This variable had the largest 't' value of any of the twelve in Regression I.1 and the second largest 't' value in Regression I.2. Its regression coefficient of .15 in Regression I.2 implies that extending the closing date for registration from, say, one month to one week prior to election day would tend to increase the percentage of the population registered by about 3.6 per cent. For politicians, varying the closing date for registration would thus appear to be a very effective way in which to manipulate the size of the potential electorate." (p. 367) [Footnote omitted]

tration process is cumbersome. Furthermore, many qualified electors are unaware of its availability or of the procedure required for such registration. The voter must first obtain a lengthy form of application from his Board of Election, fill in extensive detailed information, have the form notarized, and file it with the Board. Where the voter is required to be outside of the county of his residence because of employment or schooling, he must obtain and furnish an affidavit from his employer or from an official of the school attended by him.

In short, absentee registration requirements constitute an obstacle course rather than a procedure offering the ease and simplicity inherent in central or branch registration, which have the effect of encouraging exercise of the franchise. Voluntary registrars have set up and manned tables in various strategic locations in New York City that are usually frequented by large numbers of people (e. g., department stores, subway entrances), where voters can register with a minimum of inconvenience. The public has been advised by advertisement and word of mouth that voters may register at such locations, with the result that many citizens are encouraged both by the convenience of the locations and the ability (particularly when language or literacy problems exist) to obtain speedy, firsthand advice from the registrars to register.

Similar branch registration procedures adopted by Nassau County would, if continued during the month of September, likewise result in the registration of many voters who would not otherwise register. Although the Nassau County Board of Elections has not exercised its power under § 355 to deputize unpaid volunteer registrars, it has put into effect a system of mobile unit registration whereby a mobile van appears on given dates at advertised locations for the purpose of registering voters. Nassau County's high schools have also organized and conducted "registration trips" in which voters are transported from nearby high schools to the office of the County Board where they register.

A new factor has been introduced into the registration picture which lends additional support to the generally accepted conclusion that if registration facilities were made available in September many voters who would not otherwise register will grasp the opportunity to do so. This year we witness the enfranchisement for the first time of thousands of persons 18 to 20 years of age as a result of the adoption of the Twenty-Sixth Amendment. Many of these potential new voters have not registered to date because they have been outside of the county of their residence, at schools, summer jobs or vacations. Since many will return in September, only to depart shortly to attend schools elsewhere, their only opportunity for registration in person will be in September.

During the last few weeks the Presidential campaign has begun to develop into a vigorous political contest. If history repeats itself, the campaign will intensify during September. That this approach toward a political crescendo will increase public desire to register in September is reflected in the trend of registrations during the last month or two. In New York County (Manhattan), for instance, during the 13-day period July 18–31, 1972, voluntary deputy registrars registered approximately 8,500 voters. Gradually the number of such registrations has increased to a rate of 9,000 *per week* during the period August 14–28, 1972, and 10,000–15,000 *per week* during the period August 28–September 2, 1972. A similar sharp increase is reflected in figures for Kings and Bronx Counties, as well as for central registration in Nassau County, which climbed from 131 on August 1, 1972, to 600 on August 29, 1972.

Thus it is clear that the key to increasing participation in the democratic process lies in making registration available during crucial periods of voter interest on a relatively liberal basis, and that the imposition by states of requirements that bear no reasonable relation-

ship to a compelling legitimate state interest will have the effect of disenfranchising many qualified members of the electorate and denying them the right to vote, which is one of the fundamental and precious rights of a United States citizen. Voting Rights Act Amendments of 1970, § 202(a), 42 U.S.C. § 1973aa–1 (a); see Williams v. Rhodes, 393 U.S. 23, 31, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968); Reynolds v. Sims, 377 U.S. 533, 562, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); Yick Wo v. Hopkins, 118 U.S. 356, 6 S. Ct. 1064, 30 L.Ed. 220 (1886); Dunn v. Blumstein, 405 U.S. 330, 336, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972); Kramer v. Union Free School District, 395 U.S. 621, 626, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1959).

Congress and the Executive Branch of our Government have recognized the necessity of striking down those state-erected burdens upon registration which are unnecessary and which cannot be justified by a compelling state interest. In 1965 Congress passed a Voting Rights Act aimed principally at invalidation of state laws designed through various tests and devices to deny citizens the right to register and vote because of their race, creed or color. Thereafter it turned its attention to certain arbitrary, archaic and unfair barriers which have had the effect of inhibiting voter registration. These included excessive durational residency requirements, closing of registration during crucial pre-election periods, and the imposition of unreasonable preconditions to absentee registration. The result was the enactment of the Voting Rights Act Amendments of 1970, 42 U. S.C. § 1973aa (the "Act" herein). For our purposes the pertinent provision of the Act is § 202(d), 42 U.S.C. § 1973aa–1 (d), which provides that:

"[E]ach State shall provide by law for the registration or other means of qualification of all duly qualified residents of such State who apply, not later than thirty days immediately prior to any presidential election, for registration or qualification to vote for the choice of electors for Presi-

dent and Vice President or for President and Vice President in such election; . . . ."

We are satisfied that the quoted provision, which must be construed liberally to effectuate Congress' intent, Allen v. State Board of Elections, 393 U.S. 544, 565–566, 568, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969), when read in the light of its legislative history and the interpretation placed upon it by Congress, requires each state to make available reasonable opportunities for voter registration up to and including the thirtieth day immediately prior to a Presidential election.

An analysis of the legislative history of the Voting Rights Act Amendments of 1970, including the debates in both houses of Congress, reveals a clear intent to provide the broadest possible opportunity to citizens to register to vote in a Presidential election. As originally passed by the House and introduced into the Senate the bill contained a provision which would permit registration up to September 1st preceding a Presidential election, provided state law allowed registration during that period. Congressional Record, 91st Cong., 2nd Sess., Mar. 2, 1970, p. 5517. Thereupon Sen. Scott, the initiator of the bill, consented to a substitute bill introduced by Sen. Goldwater which would permit registration up to 30 days before the election and would supersede any contrary state registration procedures. Commenting on the purpose of his amended bill Sen. Goldwater, on March 11, 1970, stated:

"To put it bluntly, the election system of the world's greatest republic and democracy is not geared to insuring that the maximum number of citizens will be eligible to vote. In many ways it even discourages or makes it impossible for citizens to register . .

"Mr. President, the record should show that there is another important group of citizens who will benefit from the requirement that States shall keep their voting lists *open until at least 30 days before a Presidential election.*

"The point must be made absolutely clear that my amendment is intended to remove all the insidious effects which these archaic statutory limitations may have on a citizen's free exercise of his right to choose the President.

"To this end, my proposal is expressly designed to help not only new residents of a State but also citizens who have lived for a long time in a State.

"Mr. President, one of the most bizarre features now included in some States' election laws is the fact that citizens who have just moved into a State may register to vote as late as 30 days or even 5 days before a presidential election, but longtime residents of that same State are required to apply for registration as much as nine months before the election.

"What nonsense. Nine months prior to the election few people may be thinking about that event. But by 30 days before the polls open, political interest will have reached fever pitch.

"So, I want to make very clear that my proposal is intended to mean that all citizens, both new residents and longtime residents, shall be permitted to register or otherwise qualify to vote for their President *at least until 30 days before the election.*" (Emphasis added) Congressional Record, Mar. 11, 1970, pp. 6989–6991.

Various states have imposed numerous limitations. Frequently, for instance, the registration office in a county would be open only a few hours a day or on one or two days a week. In some states the office would be closed so far in advance of the Presidential election that when the elector, aroused to register by the development of a vigorous political campaign, presented himself for registration, he would be denied that right. See the McGee Hearings, *supra,* pp. 72–74.

With a view to prohibiting the continuation of such archaic practices, Congress adopted the Goldwater substitute bill and provided that those who applied not later than thirty (30) days prior to a Presidential election should not be denied the right, if otherwise qualified, to register. The 30-day cutoff date recognized the necessity of closing registration offices sufficiently in advance of the election to enable registrars to conduct investigations designed to protect against fraudulent registration and to perform essential clerical duties needed to prepare voting lists and other records for election day.

Admittedly the language of § 202 (d) of the Act does not specify the precise period of time during which registration facilities should be kept open immediately prior to the 30-day cutoff date. As Judge Learned Hand once said, however, "There is no surer way to misread a document than to read it literally. . . . As nearly as we can, we must put ourselves in the place of those who uttered the words, and try to divine how they would have dealt with the unforeseen situation. . . ." Guiseppi v. Walling, 144 F.2d 608, 624 (2d Cir. 1944). Following this sage advice, we prefer to read the language of the statute here under consideration in the light of the objectives revealed by its legislative history. Since Congress' purpose was to *extend* the period during which a voter might register, it is readily apparent that it intended to require the states to make registration available at reasonable times during the period prior to the cutoff date. Otherwise a state could frustrate the law by closing registration facilities for months prior to the cutoff date and purport to satisfy the literal language of the statute by offering registration for one day only.

Our interpretation of the pertinent provision of the statute accords with that taken by the Supreme Court, Congress and the President since the Act was passed. In a recent decision, Dunn v. Blumstein, 405 U.S. 330, 92 S. Ct. 995, 31 L.Ed.2d 274 (1972), Justice Marshall, speaking for the Court, stated: "In § 202 of the 1970 Federal Voting Rights Act, Congress . . . prohibited the States from closing registration

more than 30 days before such elections" (405 U.S. at 344, 92 S.Ct. at 1004). On July 31, 1972, President Nixon, in furtherance of a non-partisan effort to maximize registration of voters during their peak period of interest in the political process, declared September 1972 to be "National Voter Registration Month" (P.L. 92–350) as authorized by Congress in a unanimously adopted Joint Resolution, which provides:

"Resolved by the Senate and House of Representatives of the United States of America in Congress assembled, That in recognition of the importance of Congress promotion and encouragement of voter registration by all qualified citizens, especially those newly enfranchised by the twenty-sixth amendment to the Constitution, the President is authorized and directed to proclaim the period beginning September 1, 1972, and ending September 30, 1972, as 'National Voter Registration Month', and to call upon the people of the United States to observe such month with appropriate ceremonies and activities."

To the extent that § 355 would prohibit a voter from registering personally in September, it is in direct contravention of § 202(d) of the Act which prevails under the Supremacy Clause, since we declare that such provisions of § 355 violate a controlling federal statute, it becomes unnecessary for us to decide whether they also violate the First and Fourteenth Amendments to the Constitution. See Rosado v. Wyman, *supra*; Wyman v. Rothstein, *supra*.

There remains the question of the times when and places where the defendants should be required to offer to its voters during September the opportunity to vote in the Presidential election. Defendants request that, short of being permitted to suspend registration during September, their obligations under § 202(d) be kept to a minimum for the reason that they need time to perform clerical and investigatory tasks required by the Election Law in order both to insure against error or fraud and to process registration records required for use on election day. Unquestionably the administrative burden upon county boards of elections is a heavy one. Under the central registration procedure that would be required by our order, a voter would initiate registration by filling out forms either at an office of a county Board of Elections or at one of many branch stations manned by volunteer registrars. (In Nassau County the voter might register at a mobile registration unit.) Thereupon the staff of the Board of Elections must perform a series of processing steps, including the checking of forms for accuracy, the issuance of invitations to voters to correct irregularities, the locating and recording of the voter's Assembly and Election Districts, the preparation of a series of forms, including police check cards which are forwarded to the Police Department for verification of the voter's residence, the segregation of Party Enrollment forms, the mailing of an I.D. card to the registrant, etc. In addition, the time of part of the staff would be required for processing of independent nominating petitions, which involves review and resolution of objections, response to ensuing litigation, and preparation and mailing of absentee ballots.

██ Without minimizing the administrative burden upon the Boards of Elections, we must not lose sight of the fact that we are here dealing with a most fundamental aspect of our free and democratic society—the citizen's right to vote. When that is weighed in the balance against clerical inconvenience, the latter must give way. The state may not deny a voter the right to register (and hence to vote) because of clerical deficiencies. See Shapiro v. Thompson, 394 U.S. 618, 633, 89 S.Ct. 1322, 22 L. Ed.2d 600 (1969). The remedy lies in providing more clerks rather than in registering fewer voters. But even if this course were unavailable, we are satisfied by the evidence that the Boards of Elections of New York City and of Nassau County can, if the present registration procedures are continued during

a substantial part of September, perform the required tasks.

David N. Dinkins, President of the Board of Elections of the City of New York, who is familiar with the clerical tasks required by voter registration, testified that the Board's present clerical staff will be able to do all work required by central and volunteer branch registration without additional assistance through September 16, 1972, and that the Board is in a position to obtain sufficient additional clerical personnel, who would require little or no training, to handle registration through the balance of September. Similar testimony was given by Marvin Cristenfeld, Commissioner and Secretary of the Board of Elections of Nassau County, with respect to its ability to carry out these clerical functions which are needed to continue registration through September. He testified that its staff as presently constituted could handle such an extension of registration through September, and that, while he did not believe additional assistance was needed, sufficient volunteer assistance could readily be obtained from the League of Women Voters.

Board of Elections' officials have furthermore estimated on the basis of experience in prior Presidential election years that in the four days set aside for local registration in October approximately 100,000 persons will register in Nassau County and over 453,000 persons in New York City, each of whose applications for registration will be processed prior to election day in accordance with the same procedures as those described for central registration except that Assembly and Election Districts will be designated locally. Since the counties are clerically equipped to handle this large load during the last four weeks before the November 7th election, we are satisfied that they should be able to handle the smaller number that would register during the first few weeks of September through central and branch registration (the latter being conducted entirely by volunteer unpaid registrars in New York City).

We turn to plaintiffs' attack upon defendants' refusal to permit registered voters to act as volunteer deputy registrars unless they are enrolled members of the Republican or Democratic Party. Article II, § 8, of New York's Constitution provides that all laws regulating or affecting boards or officers charged with the duty of registering voters, distributing ballots, and recording and counting of votes, shall secure equal representation of the two political parties which at the next preceding general election cast the highest and next highest number of votes, respectively. Plaintiff First Vote has enlisted the support of hundreds of registered voters who have been refused the right to act as unpaid volunteer registrars for the reason that they are not enrolled Republicans or Democrats but are independents or members of the Conservative or Liberal Party. Plaintiffs contend that the foregoing provision of the New York Constitution and §§ 39 through 42–b of the Election Law, which implement it, violate their rights under the First Amendment, the Equal Protection Clause, and the Voting Rights Act Amendments of 1970. We disagree.

It is true that if registered voters were permitted to engage in voluntary registration activities regardless of their party enrollment more persons might be registered than under New York's bi-partisan system. However, we are not here dealing with the citizen's fundamental right to vote, but with the right to act as a registrar of voters. Although independents, Conservatives and Liberals are not permitted by New York to function as registrars, qualified electors will still be afforded ample opportunity to register, either centrally or locally. Indeed we have been advised by plaintiffs that in New York City alone they have approximately 4,000 Democrats and 500 Republicans prepared to continue voluntary registration activities.

Although some state restrictions upon the formation and registration of new political parties have been struck down

as flagrantly invidious and unjustifiedly discriminatory, Williams v. Rhodes, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968), nothing in the Constitution or in the Voting Rights Act Amendments of 1970 mandates that voter registration be conducted through particular personnel or procedures, as long as the voter's right to register is assured. But even assuming *arguendo* that once a state permits volunteers to engage in registration activities discrimination in the selection of eligible registrars will be tolerated only if it is justified by a compelling state interest, ample justification is shown here for limiting registrars to bi-partisan teams consisting of one member of each of the two major political parties. The purpose of this long-standing requirement, which is set forth in detail in the legislative history of Art. II, § 8, of New York's Constitution, is to minimize the risk of fraud or irregularity that might exist if registration by a representative of one party or by an independent were permitted. See N.Y. State Constitutional Convention 1894, Rev.Rec.Vol. 3, pp. 110–11, 255.

Fraud in the registration of voters has existed in New York, see Key, Politics, Parties and Pressure Groups (5th ed. 1964), pp. 628, 629, n. 7, 636–37, and it would be naive not to recognize the risk of repetition. It is not inconceivable, for instance, that if any registered voter were permitted to engage in registration activity, he might fail to turn in to his county board of elections those party enrollments considered by him to be contrary to his own political beliefs. It was to protect against such risks that New York adopted its bi-partisan requirement. The presence of representatives of the two major parties, while not guaranteeing against all fraud, diminishes the likelihood of its occurrence. The ideal system might envisage the additional presence of representatives of independent voters and of minor parties. The present record, however, does not afford a basis for determining fairly the issue of whether the persistence of minority parties does not require a fresh examination of the adequacy of the bi-partisan requirement in meeting the aim of preventing fraud in party enrollment and in primary voting.

CONCLUSION

To the extent that § 355 of the New York Election Law prohibits a voter from being afforded the opportunity at reasonable times during the month of September, 1972, to register personally for the purpose of voting in the 1972 Presidential election, we declare that it violates § 202(d) of the Voting Rights Act Amendments of 1970, 42 U.S.C. § 1973aa–1(d).

In view of our conclusion that § 355 violates the Voting Rights Act Amendments of 1970 we consider it unnecessary to decide whether § 355 violates any of the Amendments to the Constitution as alleged in plaintiffs' Second Cause of Action.

The Third, Fourth and Fifth Causes of Action, which attack as unconstitutional New York laws restricting registrars to representatives of the two political parties which at the next preceding general election cast the highest and next highest number of votes, respectively, are dismissed.

We direct the Commissioners of Election of New York City and Nassau County, in accordance with their obligation under the Voting Rights Act Amendments of 1970, to make available to voters within their respective jurisdictions the opportunity to register during regular business hours on at least four (4) weekdays per week until and including Saturday, September 23, 1972. This direction permits the Boards to suspend registration during the period from September 23, 1972, to October 4, 1972, in order to prepare for local registration on October 5, 6, 7 and 10, 1972. In the event that these Boards encounter insurmountable difficulties in complying with this direction, they may apply for modification. In the meantime, however, our order stands.

The Secretary of State of New York, in accordance with his statutory duties,

**590**

N.Y. Election Law § 82, is directed to inform the boards of elections of each county in the State of New York, other than Nassau County and the New York City Board of Elections, of our decision declaring that § 355 of the Election Law violates the Voting Rights Act of 1970. The responsibility will then fall upon each such board to comply.

It is so ordered.