**MISSISSIPPI STATE CHAPTER, OPERATION PUSH, et al., Plaintiffs,**

v.

**William A. ALLAIN, Governor of Mississippi, Edwin Lloyd Pittman, Attorney General, Dick Molpus, Secretary of State, Mississippi State Board of Election Commissioners, Lillie B. Brown, Circuit Clerk Quitman County, Robert Carter, Circuit Clerk Panola County, Martha Sellers, City Clerk Crenshaw, Miss., Billy Jones, City Clerk Sledge, Miss., Royliene Griffin, City Clerk Crowder, Mississippi, et al., Defendants.**

Civ. A. No. DC 84–35–D–O.

United States District Court,
N.D. Mississippi,
Delta Division.

Nov. 16, 1987.

Judith Reed, NAACP Legal Defense and Education Fund, Inc., New York City, Frank R. Parker, Lawyers' Committee for Civil Rights Under Law, Washington, D.C., Johnnie Walls, Greenville, Miss., for plaintiffs.

T. Hunt Cole, Jr., Spec. Asst. Atty. Gen., Hubbard T. Saunders, IV, Jackson, Miss., Andrew R. Carr, Jr., Memphis, Tenn., for defendants.

## MEMORANDUM OPINION AND ORDER

DAVIDSON, District Judge.

Invoking this court's federal question and civil rights subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 and 42 U.S.C. § 1973j(f), the eight named individual plaintiffs and two organizational plaintiffs brought this voting rights action individually and on behalf of two plaintiff classes which have previously been certified in this action as: (1) all black citizens of Mississippi who are eligible to vote but are not registered to vote, and (2) all black registered voters in Mississippi. Fed.R. Civ.P. 23(b)(2). The plaintiffs challenge Mississippi's dual registration requirement and prohibition on satellite or off-site voter registration under the Fourteenth and Fifteenth Amendments to the United States Constitution, Section 2 of the Voting Rights Act of 1965, as amended, (42 U.S.C. § 1973), and under 42 U.S.C. §§ 1971 and 1983. The plaintiffs seek declaratory and injunctive relief against the continued enforcement of several Mississippi statutes which regulate voter registration in the above indicated manner.

This action was filed on March 1, 1984. At that time there was already legislation pending in the Mississippi Legislature which would amend a number of the challenged statutes. Some of the bills had been reported out of committee at that point in time. Eventually, the challenged statutes were amended in the 1984 session of the Legislature and were submitted to the United States Attorney General for preclearance under Section 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973c. After the amended statutes were passed, the defendants moved to dismiss this action for mootness.´

In denying defendants' motion to dismiss, the court recognized that the amended statutes did not completely eliminate either dual registration or the prohibitions on satellite or off-site voter registration.[1] This action, therefore, challenges the continued restrictions and limitations on free and equal voter registration, as well as other obstacles to voter registration purportedly created by the Mississippi statutes, including the uncontrolled discretion given county voting registrars. Plaintiffs

1. The court had previously acknowledged that while the 1984 amendments did not entirely eliminate the problems associated with dual registration and the prohibitions on off-site or satellite registration, they were surely a vast improvement and represented the Legislature's recognition of the restrictive nature of voter registration in Mississippi. The court, however, is of the opinion that the subject statutes did not go far enough to totally eliminate the restrictive climate surrounding voter registration in Mississippi.

contend that the retention of unguided discretion and a statutory scheme that has been historically used to disenfranchise black citizens of Mississippi unnecessarily burdens the participation of black citizens in the political process and that, in the application of this statute, registrars have used this discretionary authority in a racially discriminatory manner.

Following extensive discovery, a pretrial conference, and the entry of a pretrial order, this action was tried before the undersigned United States District Judge, sitting without a jury, in Oxford, Mississippi. Having considered the oral and documentary proof received at trial and the parties' pretrial memoranda, proposed findings of fact and conclusions of law, and supplements thereto, the court makes the following findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52(a) and in accordance with the Fifth Circuit's requirement of detailed findings of fact in voting rights cases. *Velasquez v. City of Abilene, Texas,* 725 F.2d 1017, 1020–1021 (5th Cir.1984).

## FINDINGS OF FACT

### I.  GENERAL BACKGROUND

A.  The Parties.

1.  The named plaintiffs, Charles Green, Eugene Pressley, L.C. Felix, Bessie Tucker, Lawrence Diggs, and Randy Curtis, are all black citizens residing in various counties in the State of Mississippi eligible to register to vote but who, as of the time of filing the complaint in this action, not registered to vote. Named plaintiffs Sam McCray, Robert Jackson, and Leslie McLemore are black citizens residing in various counties in the State of Mississippi who are registered voters in Mississippi. Plaintiff Sam McCray and Robert Jackson both lost their respective bids in 1983 to be elected chancery clerk and supervisor in District 2 in Quitman County, Mississippi. Plaintiffs Quitman County Voters League and Mississippi State Chapter Operation Push, Inc., are non-profit organizations that engage in voter registration drives and other activi-

ties designed to increase black opportunities to participate in the political process.

2.  The defendants in this action are Governor William A. Allain, Attorney General Edwin Lloyd Pittman, and Secretary of State Dick Molpus, named in their official capacities and as members of the State Board of Election Commissioners. Pursuant to Mississippi Code Annotated, § 23–15–223 (Spec. Pamph. 1986), the State Board of Election Commissioners is responsible for appointing the registrars of elections in each Mississippi county.

Additional named defendants are Lillie B. Brown, Circuit Clerk and County Registrar of Quitman County; Robert Carter, Circuit Clerk and County Registrar of Panola County; Martha Sellers, City Clerk and City Registrar of Crenshaw, Mississippi; Billy Jones, City Clerk and City Registrar of Sledge, Mississippi; Royliene Griffin, City Clerk and City Registrar of Crowder, Mississippi. Defendants Brown, Carter, Jones, Sellers, and Griffin are sued in their official capacities and as representatives of the two defendant classes certified by the court in its orders of January 17 and 23, 1985, as: (1) all Mississippi Circuit Clerks/County Registrars and (2) all Mississippi City Clerks/City Registrars, including, but not limited to, any individual serving in such capacity in any Mississippi municipality, as that term is defined in Mississippi Code Annotated, § 21–1–1 (1972).

3.  At all relevant times in this action the defendants were and have been acting under color of the statutes, ordinances, regulations, customs, and usages of the State of Mississippi.

4.  Since 1965, the State of Mississippi, and all of its political subdivisions have been covered by the suspension of tests, provisions (Section 4), and the federal preclearance of voting law changes provision (Section 5) of the Voting Rights Act of 1965, as amended, 42 U.S.C. §§ 1973b and 1973c.

B.  Pre–1984 Statutes.

5.  At the time this lawsuit was filed, to be a qualified elector for all municipal elections, a resident of a municipality was required to register with the municipal clerk

after having registered at the office of the county registrar. Miss. Code Ann. § 21-11-1 (1972). This practice was known as "dual registration".

6. Then, as now, the circuit clerks functioned as the county registrars pursuant to appointment by the Mississippi State Board of Election Commissioners. The county registrars have the power to appoint deputy registrars with the consent of the Mississippi Board of Election Commissioners. *Compare* Miss. Code Ann. § 23-5-7 (1972) *with* Miss. Code Ann. § 23-15-223 (Spec. Pamph.1986).

7. The names of electors (voters) were placed into registration books (or poll books), which were required to be maintained by municipal and county registrars. Miss. Code Ann. §§ 21-11-3, 23-5-25, 23-5-29 (1972).

8. Prior to 1984, the county registrar was not permitted to remove the registration books containing the names of county electors from his offices; however, under certain circumstances the county board of supervisors could order the registrar to spend no more than one day at any precinct in the county. Miss. Code Ann. § 23-5-29 (1972).

C. 1984 Amendments to Mississippi Election Law.

9. In the 1984 legislative session, the Mississippi Legislature enacted 1984 Mississippi Laws, chs. 457 and 460. On August 3, 1984, these amendments to the election laws took effect after having been pre-cleared by the U.S. Attorney General on that date. Subsequently, in the 1986 legislative session, the Mississippi Legislature recodified all statutes relating to registration and voting and reissued them in an "election code", enacted as 1986 Mississippi Laws, ch. 495 and published as a Special Pamphlet.

10. The offices of the Secretary of State and the Attorney General of the State of Mississippi promulgated a document entitled, "Guidelines for the Implementation of Voter Registration Procedures Under House Bills 713 and 596, 1984 Regular Session", which was distributed to the circuit clerks in the State of Mississippi on or about August 19, 1984. A meeting was held on that date for all circuit clerks and their deputies to advise them of the amendments to the voter registration and election statutes and the effects thereof on their voter registration activities.

(1) Dual Registration After 1984 Amendments

11. Pursuant to the amended statutes, particularly Mississippi Code Annotated § 23-15-223 (Spec.Pamph.1986), the clerk of every municipality with a population of 500 or more is required to be appointed as a deputy registrar, provided that such clerk is employed by the municipality on a full-time basis and that the clerk's office is opened for regular hours each day. In order to meet the statutory requirements for mandatory deputization, the city clerk's office must be open every business day, Monday through Friday each week. Municipal clerks not meeting the statutory requirements for mandatory appointment may nevertheless be appointed deputy registrars at the discretion of the circuit clerk.

12. Notwithstanding the 1984 amendments, residents of some municipalities remain subject to two types of continued "dual registration" requirements. In areas where the municipal clerk has not been appointed as a deputy county registrar, registration with the municipal clerk only entitles residents to vote in municipal elections. Furthermore, to register with the municipal clerk, one must be duly registered with an officer of the state (i.e., a circuit clerk or duly appointed deputy registrar). Miss. Code Ann. § 23-15-11 (Spec. Pamph.1986). In some municipalities, therefore, to become eligible to vote in county, state, and federal elections, residents must first register with the county registrar or a duly appointed deputy registrar. Dual registration thus persists for residents of many municipalities under 500 in population, and for residents of municipalities over 500 in population where the municipal clerk either is not full-time, does not keep regular daily office hours, Miss. Code Ann. § 23-15-223 (Spec. Pamph. 1986), or the municipal clerk has not been otherwise deputized in the State of Missis-

sippi. In the State of Mississippi, there are at least 83 municipalities with a population under 500. Exhibit P–120.

13. Although the statute now provides for the clerk of the municipality to be authorized to act as a deputy county registrar upon appointment by the circuit clerk, the operation of § 23–15–223 is not retroactive. *See* Miss. Code Ann. § 23–15–39(8) (Spec. Pamph.1986). Thus, municipal residents who registered with the county registrar prior to August 3, 1984, but who have never registered with the municipality are required to register with their city clerk as a municipal elector and may not be administratively placed on the city voter rolls. Prior to 1984, as testified at trial by several witnesses, the standard registration form did not reflect whether a voter resided within the corporate limits of a municipality within the county. *See* Miss. Code Ann. § 23–5–17 (1972). This is understandable since the voter was required to register separately with his municipal registrar. The current application for registration is a triplicate form, a sample of which is set forth in Mississippi Code Annotated § 23–15–39 (Spec. Pamph. 1986). The application now reflects, *inter alia,* a prospective voter's name, address, telephone, prior residence addresses, whether the voter resides within the corporate limits of a municipality within the county, and the voter's social security number.

### (2) Satellite Registration After 1984 Amendments

14. Under the amended statute, the county registrar may request an order authorizing the removal of the registration forms from the office of the county registrar in order to "visit and spend such time as [the registrar] may deem necessary at any regular voting precinct in his county, or if such polling place is not available, at an alternate place selected by the registrar and approved by the Board of Supervisors." Miss. Code Ann. § 23–15–37 (Spec. Pamph.1986). Registration that is conducted outside of the offices of the registrars in this manner is referred to as "off-site" or "satellite" registration. The current statutes also do not limit the number of appli-

cations which may be taken from the clerks' offices for the purpose of conducting such off-site or satellite registration.

15. Satellite registration, however, is permitted only at the request of the circuit clerk, with approval by the board of supervisors. Once approval is given, off-site registration may then be conducted in accordance with an approved plan devised by the clerk, and upon publication of notice in advance of the registration. Miss. Code Ann. § 23–15–37 (Spec. Pamph.1986). The original House Bill, as drafted by the House–Senate Conference Committee, provided that off-site registration must be held at least once a year. The original bill also contained a provision allowing circuit clerks to register voters anywhere within the geographic area of a precinct. Stipulations 177 and 178, Pretrial Order.

16. The district court in *Jordan v. Winter,* 604 F.Supp. 807 (N.D.Miss.1984) (three-judge court) *aff'd. sub nom. Mississippi Republican Executive Committee v. Brooks,* 469 U.S. 1002, 105 S.Ct. 416, 83 L.Ed.2d 343 (1984), made certain findings of fact regarding past discrimination in the State of Mississippi. The court takes judicial notice of those findings as quoted below.

> That Mississippi has a long history of de jure and de facto race discrimination is not contested. That history has been often recounted in judicial decisions and includes the use of such discriminatory devices as poll taxes, literacy tests, residency requirements, white primaries, and the use of violence to intimidate blacks from registering for the vote. The State is a covered jurisdiction under the Voting Rights Act of 1965. The Attorney General has designated 42 of the counties in Mississippi for federal registrar enforcement of the right to vote.
>
> We find that the effects of the historical official discrimination in Mississippi presently impede black voter registration and turnout. Black registration in the Delta area is still disproportionately lower than white registration.... Blacks hold less than 10 percent of all elective offices in Mississippi, though they constitute 35

percent of the state's population and a majority of the population of 22 counties. 604 F.Supp. at 811–812.

17. Mississippi's original dual registration requirement was enacted as part of the "Mississippi plan" to deny blacks the right to vote following the Constitutional Convention of 1890. Exhibit P–137.

18. Because the Fifteenth Amendment to the U.S. Constitution prohibited an express denial of the right to vote to black citizens, the 1890 Constitutional Convention adopted instead indirect voter qualifications and procedures to deny black citizens the right to vote. These included: (1) a poll tax; (2) a literacy test for voter registration, which required the applicant for registration to be able either to read a section of the Mississippi Constitution or to give a reasonable interpretation thereof; (3) a durational residency requirement of two years in the state and one year in the election district; and, (4) a disenfranchising crimes provision, all designed to exclude black citizens from participation in the electoral process. Miss. Const. Art. 12, §§ 241, 243, 244 (1890); V.L. Wharton, *The Negro in Mississippi, 1865–1890* 213–14 (1947); A.D. Kirwan, *Revolt of the Rednecks: Mississippi Politics: 1876–1925* 68–72 (1951); *Ratliff v. Bealle,* 74 Miss. 247, 266–68, 20 So. 865, 868–69 (1896); Exhibit P–137.

19. In 1892, in its next regular session following the Constitutional Convention of 1890, the Mississippi Legislature adopted a series of statutes to codify and implement the voter qualification provisions of the Constitution of 1890. Mississippi Code of 1892, ch. 113, §§ 3612, 3613, 3614, and 3631. Along with these statutes, the Legislature also adopted the dual registration requirement providing for separate voter registration for municipal elections and for the appointment of municipal registrars of voters to register voters to vote in municipal elections. Mississippi Code of 1892, ch. 93, §§ 3028, 3029.

20. Under the new voter registration requirements, by 1892 only an estimated 5.7 percent of the black voting age population of Mississippi was registered to vote.

Wharton, *The Negro in Mississippi* at 215; Exhibit P–137.

21. In 1955, Mississippi enacted a series of statutes with the obvious intent of preventing or inhibiting black voter participation, including a statutory prohibition on satellite registration designed to strengthen the existing literacy test and to prevent blacks from voting. Exhibit P–137. Previously, Mississippi law had required county registrars in each county election year to "visit and spend one whole day at each voting precinct in his county, not less than four months before said election, for the purpose of registering voters, after having given notice by publication for three consecutive weeks of the times and places of such visits." Miss. Code Ann., § 3211 (1942).

22. In an extraordinary session of the Mississippi Legislature in 1955, the Legislature enacted a statute, Miss. Laws, 1955 Extra Sess., ch. 103, which prohibited the removal of the voter registration book from the county registrar's office. This statute, along with other legislation of the extraordinary session, was apparently enacted for the purpose of racial discrimination against prospective black voters. Exhibit P–137.

23. The 1955 statute amended existing law by providing that "the registration books shall not be removed from the office of the county registrar" except by order of the board of supervisors. The statute stated:

> Provided, however, during the year of the regular county and general election, or in the event a new registration be ordered by the Board of Supervisors as provided by law, the Board of Supervisors, by proper order entered upon the minutes, may order the registrar to visit and spend not exceeding one day at any voting precinct in his county, not less than four months before said election, for the purpose of registering voters, after having given notice by publication of the times and places of such visits.

Mississippi Laws, 1955 Extra. Sess., ch. 103. This prohibition on removing the voter registration books from the county reg-

istrar's offices, first enacted in 1955, is still contained in the present statute, § 23–15–37 (Spec. Pamph.1986), with some modifications enacted in the 1984 amendments. All legislative amendments to the Mississippi registration laws, however, have retained the prohibition: "The registration books shall not be removed from the office of the county registrar". *Id.*

24. The impact of the statutes enacted in 1955 was swift. Black voter registration declined to almost half of its previous level. Exhibit P–137; United States Commission on Civil Rights, *Voting in Mississippi* 8 (1965).

25. In 1960, the Mississippi Constitution was amended to require "good moral character" as a qualification for voting. Mississippi Constitution, Article 12, § 241–A. In 1962, the Mississippi legislature enacted an additional series of statutes, including the "good moral character" test, to impede black registration, including a prohibition on any assistance in filling out voter registration forms, a ban on registrars providing applicants any reasons for rejecting their applications for registration, a requirement that the names and addresses of all applicants for registration be published in a local newspaper, and a procedure for challenging the good moral character of any applicant for registration. 1962 Mississippi Laws, chs. 570–574; Exhibit P–137.

26. In 1984, Mississippi was apparently the only state which maintained statutes explicitly requiring dual registration statewide[2] and prohibiting county registrars from removing the registration books from their offices to conduct registration. Note, *Eradicating Racial Discrimination in Voter Registration: Rights and Remedies Under the Voting Rights Act Amendments of 1982*, 52 Fordham Law Review 93 n. 7, 103 n. 51 (1983).

27. As Dr. Steven Hahn, a history professor at the University of California at San Diego testified, Mississippi's statutory dual registration requirement and prohibition on removing the voter registration books from the offices of the county registrars were adopted for a racially discriminatory purpose.

## II. DISCRIMINATORY RESULT OF THE CHALLENGED STATUTES

28. The remaining features of Mississippi's dual registration requirement and the prohibition on satellite registration have a discriminatory result and deny black voters equal access to the political process.

29. Recent federal court decisions of which this court takes judicial notice have made statewide findings that are applicable to this case. These courts have found: (1) that there is an extensive past history of purposeful official discrimination in Mississippi that has touched on the right of black citizens to register, to vote, and otherwise to participate in the democratic process; (2) that racially polarized voting has prevailed in Mississippi elections, resulting in the defeat of black preferred candidates by white bloc voting and in black voters being unable to elect candidates of their choice; (3) that there continue to exist socio-economic disparities between whites and blacks in Mississippi that impair equal access to the political process in Mississippi; (4) that there is evidence of racial campaign tactics still being used in Mississippi; and (5) that the percentage of elected officials who are black remains disproportionately low. *Martin v. Allain*, 658 F. Supp. 1183 (S.D. Miss.1987); *Jordan v. Winter, supra.*

30. The findings of these other courts are also supported by the evidence in this case.

31. Dr. Allan J. Lichtman, Dean of the College of Arts and Sciences at American

---

**2.** By contrast, Florida law at that time explicitly prohibited such dual registration. *See* Fla.Stat. Ann. § 98–041 (West 1983). Neighboring states such as Alabama, on the other hand, placed the duty on municipalities to enter into contracts with the county voting registrars to identify voters qualified to vote within the municipality and prohibited voters from registering more than once. *See* Ala.Code §§ 11–46–4; 17–23–2; 17–4–125; 17–4–139 (1984). Tennessee merely permitted voters registered for statewide elections to vote in the appropriate municipal elections, provided they met a minimum residency requirement. *See* Tenn.Code Ann. §§ 2–2–107 and 6–53–102 (1983).

University in Washington, D.C., testified extensively as an expert on behalf of plaintiffs and submitted a report in support of his conclusion that blacks continued to be registered to vote in substantially lower numbers than whites. Exhibit P–130.

32. Dr. William P. O'Hare, a demographer with the non-profit corporation known as Population Reference Bureau, testified concerning the remaining substantial socio-economic disparities between blacks and whites in Mississippi. In his report presented to the court, Dr. O'Hare concluded that the lower availability of automobiles to blacks and the restrictions on satellite registration and restricted registration hours have all had and continue to have a disparate impact on blacks. Exhibit P–133. Dr. O'Hare also testified that the unavailability of telephones to some 30 percent of black households in Mississippi makes it more difficult for blacks to obtain information about procedures for registering to vote. Exhibit P–133.

33. The court notes that these various factors of automobile unavailability and restricted registration sites and hours would presumably also have an adverse impact on poor whites in Mississippi. It is highly improbable, in the court's estimation, that all poor persons in Mississippi are black. Indeed, State Senator Henry Kirksey testified that the 1984 amendments to Mississippi's election laws have had a discriminatory impact on all "poor people", but especially on blacks. The court is bound, however, by the record made at trial and the record is devoid of any probative evidence from defendants regarding the effect, if any, of the 1984 amendments on poor whites in Mississippi.[3]

34. Based on the totality of the circumstances, proof presented in this case shows by a preponderance of the evidence that Mississippi's current dual registration requirement and current statutory prohibition on removing the voter registration books from the circuit clerk's office, Miss.

Code Ann. §§ 23–15–39, 23–15–37, 23–15–223 (Spec. Pamph.1986) result in a denial or abridgement of the right of black citizens in Mississippi to vote and participate in the electoral process.

A. Voter Participation Rates for Blacks.

35. According to a recent analysis of returned jury summons performed by plaintiff's expert Dr. Lichtman, approximately 54 percent of voting age blacks ("VAP") are registered to vote while 79 percent of the white voting age population ("VAP") are registered to vote. Exhibit P–130. However, the 1984 census survey results indicate 85.6 percent of Mississippi's black VAP report that they are registered to vote and 81.4 percent of Mississippi's white VAP report that they are registered.

36. In order to arrive at a reliable estimate of voter registration rates, by race in Mississippi, Dr. Lichtman studied the returned jury questionnaires/summonses for the United States District Court for the Northern District of Mississippi. The questionnaires ask for, *inter alia,* racial identification of the voter, and are sent to a random sample of registered voters. The returned questionnaires for the years 1981–85 analyzed by Dr. Lichtman constitute a sample of all eligible persons, since this sample excluded those who had become ineligible as a result of address changes or death. Exhibit P–130.

37. Analysis of 19 mailings from the four divisions of the Northern District of Mississippi disclosed a lower rate of registration for blacks than for whites at three postulated rates of registration. Independent tests meeting stringent statistical criteria ruled out the possibility that random error in sampling black over-representation among the returned questionnaires is responsible for the finding that the white registration rate exceeds the corresponding rate for blacks. Exhibit P–130.

38. Results gained from this analysis of the jury selection process were also used to

---

3. The court is of the opinion that restrictive registration procedures would undoubtedly inconvenience all poor persons, especially rural poor persons, both black and white. *Cf. Clark*

*v. Marengo County,* 469 F.Supp. 1150 (S.D.Ala. 1979) (finding that restrictive registration practices inconvenienced all rural residents).

estimate the actual rates of valid registration for blacks and whites in the entire state. Two independent estimation procedures indicated that probably only 71 percent of the state's overall VAP was validly registered to vote in 1984. Exhibit P–130. When the white versus black differentials for the Northern District were applied to this overall registration rate, the result for 1981 to 1985 shows that the valid registration rate for whites is approximately 25 percentage points above that rate for blacks. *Id.*

39. Census data notwithstanding, it is clear that black registration lags behind that of whites in Mississippi. Both the standard sources of information on voter registration—census data and Mississippi's official registration statistics—have been shown to be unreliable. The census data concerning registration are based on self-reporting, which research has shown to be inaccurate when the self-reported data on registration and voter turn-out are compared to actual registration and voting records. J. P. Katosh and M. W. Traugott, *The Consequences of Validated and Self-Reported Voting Measures,* 45 Public Opinion Quarterly, 519 (1981); Exhibit P–130. The 1984 census figures are also based on a survey of a very small sample of Mississippians, which may or may not reflect their proportion in Mississippi's population, and an even smaller group of black respondents. The parties also stipulated that the figures presented in this census survey are "weighted", are self-reported, and are not validated in any manner by the Bureau of the Census.

40. Dr. Lichtman testified that while substantial disparities for all states exist between the actual vote cast and the vote expected based on the census survey, for Mississippi the percentage of discrepancy, or over-estimation of voting, was 32.75 percent, which was considerably larger than the average discrepancy for other states. Exhibit P–130.

41. According to Dr. Lichtman, there are a number of reasons for the inaccuracy in self-reported registration and turnout rates. First, responses to questions that require recollection of past events are not likely to be as accurate as questions on items of present fact. Second, answers to questions that require simply a yes or no answer, rather than questions that require specific information, require less thought. Moreover, respondents are more likely to give a yes answer to a question asking whether they have registered or voted because it is likely that the respondent will view an affirmative answer as a better answer, even though not necessarily the correct answer. D. Cahalan, *Correlates of Respondent Validity in the Denver Validity Survey,* 41 Public Opinion Quarterly 621 (1968). Additionally, a number of studies have clearly indicated that blacks tend to over-report registration and turn-out in a far greater proportion than do whites, even when the differences in socio-economic status and other factors are controlled for in a regression analysis. P.R. Abramson and W. Claggett, *Race–Related Differences in Self-Reported and Validated Turnout,* 46 Journal of Politics 719 (1984); R.D. Shingles, *Black Consciousness and Political Participation: The Missing Link,* 75 American Political Science Review 76 (1981).

42. Dr. Lichtman explained that the unreliability of the official Mississippi registration statistics stems from inconsistent purging of the registration rolls and the absence of consistent race-specific data. In many counties, the number of persons reported and recorded as registered exceeds either the population as a whole or the voting age population of the county. The likelihood that the official statistics are incorrect is bolstered by a comparison between the number of individuals listed on the registration rolls and the voter turn-out in elections. While official records indicate that in 1984, 92.2 percent of the VAP was registered, making Mississippi's registration rate the highest in the nation, only 56.4 percent of the registered voters actually turned out to vote. Dr. Cloward, another of plaintiffs' experts testified that there is a strong, positive correlation between voter turn-out and voter registration. Thus, a large percentage of registered voters

should have been mirrored by a large voter turnout in Mississippi.

43. Defendants have provided no expert testimony on the question of registration rates or any other subject in this dispute, but instead have relied on the clearly unreliable official state statistics and the unvalidated 1984 census data.

44. Neither the official state registration statistics nor the 1984 census data can be relied upon to give an accurate count of registered voters by race, for the reasons detailed above. Plaintiffs have shown by a preponderance of the evidence that black citizens of Mississippi are more likely than not registered at a rate of approximately 54 percent of the black VAP, while whites are more likely than not registered at a rate of approximately 79 percent of the white VAP. Thus, the black registration rate is approximately 25 percentage points below the white registration rate.

**B. Current Discriminatory Results.**

45. Since 1984 the dual registration requirement has continued to have a discriminatory impact on blacks. More black citizens than white have been denied the right to vote in municipal elections, because their names could not be found on municipal voter registration rolls, and this has probably resulted in the defeat of black candidates.

46. According to reports of federal observers and as stipulated by the parties, in the following municipal elections, the following numbers of persons, by race, were not permitted to vote in the municipal elections listed below, because their names could not be found on the city voter rolls:

| CITY | YEAR | TOTAL | WHITE | BLACK |
|------|------|-------|-------|-------|
| Holly Springs | 1985 | 383 | 48 | 335 |
| Moorhead | 1985 | 47 | 3 | 44 |
| Clarksdale | 1986 | 208 | 15 | 193 |
| Marks | 1987 | 148 | 7 | 141 |
| Tutwiler | 1987 | 73 | 3 | 70 |

47. In the March 10, 1987 municipal Democratic primary election in the City of Marks, Mississippi, 56 voters who had registered to vote with the Quitman County Circuit Clerk prior to August 3, 1984, but who had not registered with the Marks Municipal Clerk, were required to cast affidavit ballots by election officials. These affidavit ballots were later rejected and not counted by the Marks Municipal Democratic Committee. All 56 of these voters were black. In that election, two black candidates for the board of aldermen lost by voter margins less than the number of affidavit ballots that were rejected. A black candidate running for an at-large position lost by 40 votes. In Ward 3, a black candidate lost by only one vote. At least 15 of the affidavit ballots rejected were cast in Ward 3. A black was, however, later elected as Mayor of Marks on April 7, 1987 and a black was elected to one of five aldermen positions in the City of Marks.

**C. Socio–Economic Disparities.**

48. Disparities exist between white and black citizens throughout Mississippi in the areas of education, income, employment, housing and other socio-economic categories. For example, the median income of black families in Mississippi in 1979 was only 51.1 percent of that of white families, while the percentage of black citizens living below the poverty level was almost four times the percentage of whites living below the poverty level in Mississippi. Of white Mississippi residents age 25 and older in 1980, 63.9 percent had finished high school and 14.4 percent had completed four or more years of college, while the comparable figures for black residents were 33.2 percent and 7.1 percent, respectively. Exhibit P–133. The unemployment rate for blacks 16 years of age and over was 17.9 percent, according to the 1986 estimate compiled by the Mississippi Employment Security Commission, while for whites the corresponding figure was only 6.7 percent.

49. The continued statutory prohibition on satellite registration and the remaining vestiges of the dual registration requirement have a disparate impact on the opportunities of black citizens in Mississippi to register to vote because of their socio-economic and occupational status. Again, the court notes that a similar impact is in all probability suffered by whites of low socioeconomic status, however, no proof on this fact was offered by defendants.

50. Dr. O'Hare testified and the court finds that black workers in Mississippi predominate in blue-collar and service worker positions in which they are likely to be working for an hourly wage and are less likely to be able to take off from work to register to vote during the regular office hours that the circuit clerk's and municipal clerk's offices normally are opened.

51. As explained in Dr. O'Hare's report and testimony, black citizens also are much less able than whites to travel to the county courthouse, or other centralized voter registration locations to register to vote. According to the 1980 census, 27.8 percent of all black-occupied households have no vehicle available at home for household use, as compared to 6.76 percent of white-occupied households. This disparity is particularly severe in the Delta area of the state which includes most of the black majority counties of Mississippi. There are 27 counties in Mississippi where the ratio of black households without a vehicle to white households without a vehicle is 4.0 or more, and a disproportionately high number of these are the black majority counties in the Delta area.

Lay witnesses testifying for plaintiffs corroborated Dr. O'Hare's findings, stating that many of their volunteer voter registration drives conducted were dependent on the provision of transportation to prospective voter registrants. In addition, a disproportionately high percentage of black households do not have a telephone available for household use. Exhibit P–133.

52. Dual registration, compounded by limited hours for registration, was and is particularly onerous on poor persons in Mississippi. As previously noted, a disproportionate number of the poor persons in Mississippi are black.

D. Current Barriers to Registration.

53. Difficulty in registration is the main reason for not voting. As Dr. Cloward testified, studies have shown that once registered, about 85 percent of registered voters do in fact turn out to vote in presidential elections.

54. Thus, while Mississippi's registration laws no longer contain provisions that allow registrars to administer explicit tests to citizens, the fact remains that the statutes permit administrative barriers. These administrative barriers are harder to overcome for persons of lower socio-economic status and persons of lower educational attainment, a group that is disproportionately black. Again, this court is prevented from reaching any finding as to the effect of these income and administrative barriers on whites of lower socio-economic status as a result of the defendant's failure to offer proof as to the effect of income and administrative barriers on poor whites in Mississippi.

(1) Failure to Mandate Deputization of all Municipal Clerks

55. As noted above, only municipal clerks who have been appointed as deputy registrars are authorized to register county electors, i.e., voters who are eligible to vote in county, state and federal elections. Miss. Code Ann. § 23–15–35 (2) (Spec. Pamph.1986). In counties with only one municipality, persons who wish to register to vote are required to come into the county seat to register if no off-site plan for satellite registration has been requested and approved. A few examples demonstrate the effect of this limitation on appointment of deputy registrars.

56. Panola County residents of the towns of Crowder, Crenshaw, Pope and Courtland who desire to be eligible to vote in a county or national election are required to travel to Sardis or Batesville, a distance ranging from 5 miles to more than 15 miles one way.

57. Up until January 1987, Quitman County residents of the municipality of Falcon who wished to register to vote in non-municipal elections were required to travel to Marks, Lambert, or Sledge. Up until April 1987, Quitman County residents of the municipality of Crenshaw who wished to register to vote in non-municipal elections were also required to travel to Marks, Lambert, or Sledge, or, after January 1987, to Falcon.

58. The following Bolivar County municipalities have populations under 500: Al-

ligator, Benoit, Beulah, and Winstonville. The parties stipulated that while the Bolivar County municipalities of Duncan and Renova have populations of over 500, the clerks in those municipalities do not qualify for mandatory appointment as deputy registrars, and as of December 5, 1984, no persons had been appointed as deputy registrar for those municipalities. Thus, residents of the Bolivar County towns of Alligator, Benoit, Beulah, Winstonville, Duncan and Renova were not able to simply register with the municipal clerk located in those respective towns in order to be eligible to vote in non-municipal elections, but were required to travel to a county courthouse or the location of a deputy registrar.

59. Persons who reside in the LeFlore County municipality of Schlater or Sidon may only register for non-municipal elections on those days when a qualified deputy registrar might be present or when those persons travel to Greenwood or Itta Bena, a distance of approximately 15 miles since the clerks of the Leflore County municipalities of Schlater and Sidon have not been appointed deputy registrars.

60. The Yazoo County municipalities of Eden and Satartia are approximately 10 miles and 15 miles, respectively, from the closest deputy registrar who is located in Yazoo City. Thus, a round trip of at least 20 to 30 miles would be required to accomplish registration for non-municipal elections for residents of the Yazoo County towns of Eden or Satartia since the clerks of Eden and Satartia do not qualify for mandatory appointment pursuant to Mississippi Code § 23–15–223 (Spec.Pamph.1986).

61. Additional examples were presented at trial. Clay County, for example, has only one municipality, the county seat of West Point. These above-noted instances are indicative of the burden of the continuing requirement of dual registration on many residents of municipalities under 500 in population.

(2) The Discretion Granted by Mississippi to the Registrars

62. As discussed earlier in these findings, Mississippi has in the past used practices that impede the right to vote, and numerous courts have found certain practices discriminatory. Even now, the challenged statutes still contain a residual dual registration requirement, as well as a limitation on satellite registration. In addition, the circuit clerks retain a great deal of discretion under the amended statutes. *See* Stipulations 105, 180–188, Pretrial Order.

63. A survey of 81 circuit clerks in the State of Mississippi, conducted by plaintiffs through their first set of interrogatories to the circuit clerks, revealed that the clerks had conducted satellite registration, held evening or non-mandatory Saturday registration, or appointed deputy registrars other than regular office deputies only on a limited basis, if at all.[4]

(a) Satellite Registration

64. Under § 23–15–37, the circuit clerks may decide when and whether to make a request to the board of supervisors for approval of a satellite registration plan. A request to the board of supervisors need not be in writing, need not be made in person, nor even be made at regularly scheduled meetings of the board. These requests may be made to individual board members. Despite this fact, only 20 out of 81 clerks surveyed have made such a request. Exhibits P–72, P–73 and P–74.

65. Once the decision is made to request the authorization, subject to the approval of the board of supervisors, and providing that there is an unavailability of polling places, Miss.Code Ann. § 23–15–37 (Spec.

---

**4.** It is obvious to the court that great disparity exists throughout Mississippi as to the actual practices of circuit clerks concerning "off-site" or satellite registration. In Hinds and Jackson Counties, as testified to in the trial, extensive "off-site" voter registration has been conducted under the existing law with the resulting registration of hundreds of additional voters. Since August 1, 1984, some 18 circuit clerks have held

voter registration at polling places, and 15 have held voter registration at places other than polling places. Exhibits P–73 and P–74. The situation in Mississippi concerning satellite registration is similar to the "patchwork quilt" in New York State regarding student registration practices. *Auerbach v. Kinley*, 594 F.Supp. 1503 (N.D.N.Y.1984), *rev'd in part*, 765 F.2d 350 (2nd Cir.1985).

Pamph.1986), circuit clerks then have the discretion to decide where to conduct off-site registration. The dearth of satellite registration was not for lack of requests. In Panola County, no off-site registration was conducted during the years 1975 through 1984. A request made in October 1984 to conduct registration at the Panola High School was denied. In Bolivar County, off-site registration, as of December 19, 1984, had occurred on only three occasions (in 1976, 1979, and 1983), and then such registration was conducted only at the polling places. Plaintiff class members Viola Legette, Chairman of the Bolivar County Democratic Executive Committee, and Victor McTeer, a black attorney made two requests for precinct registration of the Bolivar County Circuit Clerk in 1984. These two requests were not presented to the board of supervisors.

66. Requests were also made to the Quitman County Circuit Clerk to visit polling places but no action was taken. Additionally, plaintiff class members David Jordan, James Singleton, Don Miller, Solomon Osborne, and Edward Florence requested the Leflore County Circuit Clerk to conduct off-site registration in Leflore County at a number of polling places and other sites. The circuit clerk never acted on these requests. Additional requests for satellite registration were denied by circuit clerks who indicated that they perceived no need for such off-site registration. *See* Exhibits P–72, P–73, P–74, P–86, P–89 and P–90.

### (b) Evening/Weekend Registration

67. The majority of the circuit clerks maintain office hours of Monday through Friday, 8:00 a.m. to 5:00 p.m., with many closed during the noon hour for lunch. *See* Exhibit P–73. Of 81 circuit clerks surveyed, only 43 had ever conducted registration after 5:00 p.m. ("evening" registration) and only a few had conducted Saturday registration in addition to that mandated by law.[5] Exhibits P–73 and P–74.

In Bolivar County, between 1976 and 1984, Saturday registration in addition to that mandated by law took place on only

one occasion, when federal registrars were present. Neither non-mandatory Saturday registration nor any evening registration had taken place in any Leflore County precincts. Additionally, requests for Saturday and/or evening registration in the Leflore County towns of Sidon and Schlater were not acted upon. The Humphreys County Clerk has held no evening registration since at least 1976. *See* Stipulations 121–131, Pretrial Order.

68. The effect and the inconsistency of the registrars' varying practices was recognized by a task force convened by Secretary of State Dick Molpus, one of the defendants in this case. The task force noted in 1984:

> Many counties engaged in off-site registration this fall, while other counties decided against such satellite registration. Some rural counties without municipalities whose clerks qualify as deputy registrars had much of the same difficulties in registration that had prevailed previously. The failure to request or approve off-site registration still results in inconvenience for the applicant. Registration is more accessible in counties which permit off-site plans to go into effect or which have several municipalities whose clerks are deputy registrars, thereby providing effective satellite registration.

### (c) Appointment of Deputy Registrars

69. Pursuant to Mississippi Code Annotated § 23–15–223 (Spec.Pamph.1986), the registrar may "appoint deputy registrars, with the consent of the Board of Election Commissioners, who may discharge the duties of the registrar." Pursuant to this appointment authority, municipal clerks, other than those meeting the statutory criteria, as well as volunteers from the community, may be appointed deputy county registrars by the circuit clerk. Yet few deputy registrars have been appointed since the amended law took effect. Indeed, in at least two instances the mandatory appointments had not been made several months after the effective date of the 1984

---

5. Mississippi law already requires that the office of the circuit clerk be open until noon on the two Saturdays prior to each election. Miss. Code Ann. § 23–15–653.

**1259**

amendment. Stipulations 108, 112–113, Pretrial Order. As of December 1984, the municipal clerk in Crowder, Mississippi, which has a population of greater than 500, had not been appointed a deputy registrar. *Id.* Similarly, in Quitman County, despite a letter dated August 8, 1984 notifying the circuit clerk that the Crenshaw Municipal Clerk qualified for appointment under the new law, the appointment had not been made as of the year end. *Id.* In April 1987, the Crenshaw Clerk was finally appointed as a deputy Quitman County registrar.[6]

70. Numerous requests for appointment of volunteer deputy registrars were denied. For example, in 1984 named plaintiff Samuel McCray, who resides in Marks, Mississippi, submitted a list of some 20 proposed volunteer deputy registrars to the Quitman County Circuit Clerk. Exhibit P–96. McCray testified that the circuit clerk in presenting his request to the board of supervisors noted that there was "no basis for" volunteer deputy registrars under the current law, and that such deputy registrars were not required. Accordingly, none of the individuals whose names were suggested as deputy registrars were deputized by the Quitman County Circuit Clerk.

Mr. David Jordan, a black male resident of Greenwood, Mississippi and president of the Greenwood Voters League, testified that a request for deputization of volunteer registrars made to the Leflore County Circuit Clerk was denied in 1984. Mrs. Myrtis Foster, a black female resident of Belzoni, Mississippi in Humphreys County, testified that she was a member of the Humphreys County Union for Progress, an organization which supports political and economic development. As part of her duties in the Humphreys County Union for Progress, Mrs. Foster testified that she participates in voter education and voter registration activities. Mrs. Foster further testified

that in May 1985 the Humphreys County Union for Progress requested that the circuit clerk for Humphreys County deputize municipal clerks in towns of less than 500 in population and that satellite and/or precinct registration be conducted at these places. The Humphreys County Circuit Clerk appointed four municipal clerks. Exhibit P–89.

71. The current statutes do not specify any criteria for the appointment of deputy registrars, and the practice of at least some of the circuit clerks is merely to rely on word-of-mouth recruitment and to use subjective criteria and qualifications for the hiring of deputy clerks. The result is that very few of those appointed as deputy registrars have been black. In January 1986, of some 278 employees authorized to register voters, only 53 were black; and of a total of 23 deputized under the amended law, including two volunteers, only six were black. Stipulations 106 and 109. Pretrial Order.

## III. JUSTIFICATIONS OFFERED FOR CONTINUANCE OF THE RESTRICTIONS ON REGISTRATION

72. Each of the defendant members of the Mississippi State Board of Election Commissioners has suggested that the distinction between municipalities based on population may be unnecessary. Exhibits P–116, P–117, P–118.

73. The rationale offered by defendants for limiting mandatory deputization to certain full-time municipal clerks was that those clerks might be more likely to be available on a regular basis for registration than are municipal clerks in small communities whose positions are part-time and who may not have occasion to conduct clerking duties more than once or twice a month. As Representative Tim Ford, the House of Representatives author of the 1984 law, testified for the defendants, he

6. The court also notes a disparity among the practices of circuit clerks with regard to the appointment of municipal clerks. For example, in Bolivar County, some 10 municipal clerks out of a total of 14 municipal clerks in the county were appointed deputy registrars between August 1984 and November 1985. By contrast, in

Harrison County all 17 of the municipal clerks in the county were deputized during the same time period. On the whole, some 230 of the 270 municipal clerks known to the circuit clerks were deputized as county registrars. Exhibits D–23 and P–73.

had "no problem" with deputization of all municipal clerks. Ford testified, however, that that provision simply did not get through the Legislature. On inquiry from the court, Ford conceded that all governing bodies of municipalities, regardless of size of the municipality, are statutorily required to have a meeting on the second Tuesday or some other designated day of each month. *See* Miss.Code Ann. §§ 21–5–13, 21–7–9 (1972); § 21–8–11 (Supp.1986).

74. The rationale offered by defendants for the requirement that the registrar obtain authorization from the board of supervisors before conducting off-site registration, is that the board is responsible for expenditures that might result from such registration and that the circuit clerks and boards of supervisors are familiar with local voter registration needs and are therefore more capable of determining when, where, and how often satellite registration would be necessary.

75. The proposed legislation would have mandated that off-site registration be held at least once a year and that the county registrar be permitted to register voters at any location within the geographic area of a precinct. The amended law as enacted, however, does not mandate that off-site registration be done for any minimum number of times per year and it limits such registration to polling places unless those places are unavailable.

The rationale offered by defendants for the preference of polling places is, as explained by Representative Ford, that since the polling place is where the prospective voter will ultimately vote, it was considered appropriate to prefer conducting registration there in order to familiarize new registrants with such polling places. Representative Ford further testified that some polling places are mobile or rented locations; therefore, these sites are not available on a regular basis for registration but are only made available at election time. This explains the language in the law referring to the unavailability of the polling place. The

so-called "preference" for the polling place does not appear to have been implemented by the practices of circuit clerks. As some circuit clerks testified, particularly Ms. Barbara Dunn, Circuit Clerk of Hinds County and Mr. Joe W. Martin, Jr., Circuit Clerk of Jackson County, when they conducted polling place registration voters did not necessarily register at the precincts where they would later vote. Rather, the circuit clerks chose a precinct or a number of precincts in those general areas in the county where they perceived a need, allowing persons from all precincts in those areas to register and a limited number of precinct or polling place sites selected for registration. Thus, persons were permitted to register at polling places who would not later vote at those precincts. This practice, although not necessarily practiced on a statewide basis, does indicate an apparent frustration of the legislature's intent to prefer registration of voters at the precincts where they would vote in order to familiarize them with the location of the polling places.

76. The rationale offered by defendants Secretary of State, Governor and Attorney General for permitting registrars to conduct satellite registration at their discretion rather than on mandatory occasions, is that registrars and county boards of supervisors were presumed to be more familiar with voter registration needs and therefore capable of determining where, when, and how often satellite registration would be necessary.

77. The rationale offered by defendants for the requirement that the application be signed in front of the registrar or deputy registrar is the prevention of fraudulent registration. This apprehension of fraud was not supported by any evidence offered by the defendants.[7]

78. The challenged statutes were not enacted for a racially discriminatory purpose but have had a discriminatory impact on the plaintiff class certified herein. More specifically, the challenged statutes

---

7. The court also finds no legitimate reason why there are no current provisions for the registration of disabled voters when such voters are permitted to vote absentee ballots merely upon showing proof of disability. *See* Miss.Code Ann. § 23–15–629 (Spec.Pamph.1986).

have a disparate impact on the voter registration of black citizens in the State of Mississippi.

79. The challenged statutes, particularly § 23–15–223 which arbitrarily sets municipalities of less than 500 apart for special consideration do not advance any substantial or legitimate governmental interest and are not rationally related to any substantial governmental interest.

## CONCLUSIONS OF LAW

1. The court has subject matter jurisdiction of this action pursuant to 28 U.S.C. §§ 1331, 1343, and 2201 and 42 U.S.C. § 1973j(f).

2. The action has been properly certified as a class action under Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure.

■ 3. Article III of the United States Constitution limits the judicial power of federal courts to cases or controversies where the party invoking the court's subject matter jurisdiction can "show that he personally suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant", *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979), and that the injury "fairly can be traced to the challenged action." *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976). Inasmuch as the plaintiffs have shown that the challenged statutes either impinge upon their protected rights to register to vote or burden their organizational efforts to assist prospective voters in registering, the court finds that all of the plaintiffs have standing to sue, *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982), to challenge the remaining features of Mississippi's dual registration requirement and prohibition on satellite registration as violative of their rights, and the rights of all persons similarly situated, under Section 2 of the Voting Rights Act (VRA), 42 U.S.C. § 1973, 42 U.S.C. §§ 1971 and 1983, and the First, Fourteenth and Fifteenth Amendments of the United States Constitution.

■ 4. The plaintiffs assert both statutory and constitutional claims in their challenge to Mississippi's voter registration laws. In an action presenting both statutory and constitutional claims, the court is obliged to decide the case on statutory grounds, if possible, and to avoid reaching the constitutional issues in the absence of a necessity for doing so. *See Escambia County, Fla. v. McMillan*, 466 U.S. 48, 104 S.Ct. 1577, 80 L.Ed.2d 36 (1984) and *Velasquez v. City of Abilene, Tex.*, 725 F.2d 1017 (5th Cir.1984). Accordingly, the court must first consider the plaintiffs' claims under Section 2 of the Voting Rights Act and 42 U.S.C. §§ 1971 and 1983.

## I. SECTION 5 PRECLEARANCE AND SECTION 2 CHALLENGES

■ 5. The defendants argue that Section 5 preclearance of the statutes involved herein precludes plaintiffs from challenging the statutes under Section 2 of the Voting Rights Act of 1965, as amended in 1982, 42 U.S.C. § 1973. The court does not agree. As recently held by Judge Barbour in the case of *Martin v. Allain*, 658 F.Supp. 1183 (S.D.Miss.1987), Section 5 preclearance does not preclude plaintiffs' Section 2 challenge. *Id.* at 1200. In explaining the reasons why Section 5 preclearance is not dispositive, the court in *Martin* wrote:

This Court accepts as proper the reasoning of Judge Phillips in *Gingles v. Edmisten*, 590 F.Supp. 345, 375–76 (E.D.N.C.1984), *aff'd in part and rev'd in part sub nom Thornburg v. Gingles*, 478 U.S. ——, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), which held that Section 5 preclearance does not preclude plaintiffs' Section 2 challenge. The standards by which the United States Attorney General assesses voting changes under Section 5 are different from those by which judicial claims under Section 2 are to be assessed by the judiciary. 590 F.Supp. at 376, *citing* S.Rep. 97–417 No. 10 at 68, 138–39. Also, because the standards for Section 5 preclearance were applied in a

non-adversarial administrative proceeding, the Attorney General's preclearance determination has no issue preclusive effect to this action and private plaintiffs can challenge a plan or procedure even after Section 5 preclearance.

This court also takes judicial notice of the fact that the Attorney General has recently filed an action in the Southern District of Mississippi which challenges some of the statutes plaintiffs have attacked in this case, i.e., the registration procedures in Mississippi. Thus, the court finds that the earlier preclearance by the Attorney General does not preclude the plaintiffs' action in the case *sub judice.*

## II. PLAINTIFFS' SECTION 2 CHALLENGE

■ 6. Congress, in enacting the 1982 amendments to Section 2 of the Voting Rights Act, intended that Section 2 should cover challenges to allegedly discriminatory voter registration practices and procedures. *See* S.Rep. No. 97–417, 10 n. 22, 12, 52 n. 180 (1982), *reprinted in* 1982 U.S. Code Cong. & Ad.News 177, 187 n. 22, 189, 231 n. 180; *United States v. Dallas County Commission,* 739 F.2d 1529, 1538 (11th Cir.1984). The statutes attacked herein appear to come within the language of Section 2, as amended, 42 U.S.C. § 1973(a):

No voting qualification or prerequisite to voting, or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in the denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in § 1973b(f)(2).

Mississippi's voter registration laws are clearly a "voting qualification" or "prerequisites to voting": no voter is qualified as an elector until he has first registered. Miss.Code Ann. § 23–15–11 (Spec.Pamph. 1986).

7. The 1982 amendment to Section 2 was intended to eliminate the necessity of proving a discriminatory intent in order to prove a statutory violation. The 1982 amendment replaces the discriminatory purpose test with a "results" test. *See Thornburg v. Gingles,* 478 U.S. ——, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986); *Velasquez, supra; Sierra v. El Paso Independent School District,* 591 F.Supp. 802 (W.D.Tex.1984). The amended Section 2 sets forth the test for establishing a violation of the Act:

A violation of subsection (a) of this section is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973(b).

8. The legislative history of amended Section 2 has been utilized by courts in formulating their analysis of whether a violation has been proven. The legislative history sets out a number of factors which may be considered by the courts:

If as a result of the challenged practice or structure plaintiffs do not have an equal opportunity to participate in the political processes and to elect candidates of their choice, there is a violation of this section [1973(a)]. To establish a violation, plaintiffs could show a variety of factors, depending upon the kind of rule, practice, or procedure called into question.

Typical factors include:

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the minority group to register, to

vote, or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. If there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are:

[8]. whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the minority group.

[9]. whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

S.Rep. 97–417 at 28–29, *reprinted in* 1982 U.S.Code Cong. & Ad.News at 177, 206–207.

9. The above noted factors do not represent an "all or nothing" test which plaintiffs must meet. Rather, plaintiffs need only show that the "totality of the circumstances" indicates a violation of Section 2. *U.S. v. Dallas County Commission, su-*

*pra.* The relevant or dispositive factors will vary from case to case, depending upon the nature of the statute or practice challenged. Quoting again from the language of the Senate Judiciary Committee Report:

While these enumerated factors will often be the most relevant ones, in some cases other factors will be indicative of the alleged [voting] dilution.

The cases demonstrate and the Committee intends that there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other.

S.Rep. No. 97–417 at 28–29, *reprinted in* 1982 U.S.Code Cong. & Ad.News at 206–207. While the Committee report makes reference to dilution, the court is of the opinion that the same language and analysis is applicable to this voter registration case and each of the relevant factors is addressed separately by the court in the following paragraphs.

A. The Extent of Any History of Official Discrimination in the State or Political Subdivision That Touched on the Right of Members of the Minority Group to Register, to Vote, or Otherwise to Participate in the Democratic Process.

10. As set forth in the court's findings of fact above, several courts have found that Mississippi has had an extensive history of purposeful official discrimination that touched on the right of black citizens to register, to vote, and otherwise to participate in the democratic process. The most recent decision so holding is *Martin v. Allain, supra,* in which Judge Barbour noted that this history of discrimination has been determined by federal courts at all levels. *Id.,* 658 F.Supp. at 1192. Instead of recounting the numerous instances of purposeful discriminatory practices and enactments related to registration and voting in Mississippi, the court accepts and adopts the findings made in the *Martin* case to the effect that a history of discrimination does in fact exist.

B. The Extent to Which Voting in the Elections of the State or Political Subdivision is Racially Polarized.

■ 11. At trial, the court permitted plaintiffs to offer testimony and evidence concerning racially polarized voting in Mississippi. The court noted, however, that instances of polarized voting were on the periphery of this voter registration case. Upon reflection, the court now concludes that whereas instances of racially polarized voting are pertinent in challenges to electoral processes, voting behavior is not germane to the challenged voter registration procedures at issue here.

C. The Extent to Which the State or Political Subdivision Has Used Unusually Large Election Districts, Majority Vote Requirements, Anti–Single Shot Provisions, or Other Voting Practices or Procedures that May Enhance the Opportunity for Discrimination Against a Minority Group.

12. As with the factor of racially polarized voting, the court concludes that voting practices are not relevant or germane to any determination of the discriminatory impact of registration practices.

D. If There is a Candidate Slating Process, Whether the Members of the Minority Group Have Been Denied Access to that Process.

13. Any candidate slating process is clearly beyond the scope of the court's consideration of Mississippi's voter registration statutes.

E. The Extent to Which Members of the Minority Group in the State or Political Subdivision Bear the Effects of Discrimination in Such Areas as Education, Employment and Health, which Hinder Their Ability to Participate Effectively in the Political Process.

14. The proof on this factor was conflicting at trial. Plaintiffs offered considerable evidence indicating the continued existence of vast socio-economic disparities between blacks and whites in Mississippi. Many of these disparities are noted in the court's findings of facts above. There was also much testimony about the disproportionate impact on blacks of the requirement that they travel either to the county seat or a distant municipal clerk's office to register to vote. The essential aim of this proof was, in the opinion of the court, to show that the failure of the State to deputize all municipal clerks as voter registrars or to eliminate other administrative barriers such as limited office hours, no off-site registration, and no weekend registration hinders blacks' ability to register to vote. Inasmuch as the defendants offered no proof to rebut the plaintiffs' showing that travel to the county seats or municipalities where the municipal clerk is deputized has a disparate impact on blacks who continue to rank predominantly within the lower socio-economic status in Mississippi, the court concludes that the state's failure to deputize all municipal clerks and to remove other administrative barriers to voter registration has "resulted in the disfranchisement of a substantial number of black citizens who are unable, because of disproportionate lack of transportation, disproportionate inability to register during working hours, or other reasons, to travel to the offices of the county registrar to register to vote...." Complaint, paragraph 22.

Similarly, the testimony plaintiffs offered regarding the failure of circuit clerks to conduct polling place registration is tied to these socio-economic factors. In the opinion of the court, although plaintiffs do suffer disproportionately from the requirement that they travel to their county courthouse or the office of a deputized municipal clerk, if some localized polling place registration were conducted the impact on plaintiffs would be significantly minimized or eliminated. The court notes that localized voting procedures have not been challenged by the plaintiffs and the court is of the opinion that if prospective voters are capable of coming to the polling place to vote, they should likewise be capable of registering without great difficulty at their local precincts. Furthermore, the proof in-

dicates that while approximately 83 municipal clerks in towns with less than 500 in population were not mandatorily deputized as county registrars, there were approximately 209 towns or cities where municipal clerks were subject to such deputization. Exhibits P–119, P–120. While this number includes some towns or cities which are county seats and at which registration was already available, the large number of additional deputy registrars has significantly increased the availability of registration sites to all individuals throughout the State of Mississippi.

F. Whether Political Campaigns Have Been Characterized by Overt or Subtle Racial Appeals.

15. Little or no proof on this factor was offered at trial. In any event, the court is of the opinion that racial appeals in campaigns or elections bear little relevance to the State's registration procedures.

G. The Extent to Which Members of the Minority Group Have Been Elected to Public Office in the Jurisdiction.

16. Evidence submitted at trial indicates that Mississippi has some 521 black elected officials, including one State Supreme Court Justice, one U.S. Congressman, and two State Senators. Exhibit D–21. On the whole, these 521 black officials as of January 1986 represented approximately 9.9 percent of the total number of elected officials—approximately 5,278 in all. The black population of Mississippi is approximately 35 percent of the total population. Exhibit D–21. Most of these black officials were elected from black majority districts. Testimony from Mr. Bennie Turner, the County Attorney for Clay County, indicated that only three black officials, including Turner, had been elected from white majority districts. This testimony corroborates the findings of the court in *Martin v. Allain* that most black officials are elected from black majority, single-member districts. *Id.*, 658 F.Supp. at 1195.

17. The Supreme Court has identified the ability of blacks to elect candidates of their choice as one of the "most important" factors in a Section 2 challenge to electoral mechanisms or procedures. *Thornburg v. Gingles*, 478 U.S. at —— n. 15, 106 S.Ct. at 2766 n. 15, 92 L.Ed.2d at 45 n. 15. The Court noted that "unless minority group members experience substantial difficulty electing representatives of their choice, they cannot prove that a challenged electoral mechanism impairs their ability 'to elect.'" *Id.* The plaintiffs have shown that they experience "substantial difficulty" in electing representatives of their choice, outside black majority districts. The proof supports such a conclusion. There are only three black elected officials from majority white districts.

H. Whether There is a Significant Lack of Responsiveness On the Part of Elected Officials to the Particularized Needs of the Members of the Minority Group.

18. Plaintiffs' proof on this factor was directed primarily to the difficulties encountered in having blacks deputized as voter registrars or in obtaining satellite registration in predominantly black locations in various counties. Several witnesses testified to the fact that their requests for deputization of black registrars were ignored or denied by circuit clerks. Similarly, a number of witnesses testified that their requests to have the circuit clerk or their deputies conduct satellite registration in black neighborhoods were denied. In this connection, the court concludes that plaintiffs have shown a significant lack of responsiveness on the part of elected officials to the particularized needs of members of the minority group which plaintiffs represent in this action.

19. The Eleventh Circuit in *United States v. Marengo County Commission, supra,* found that by "spurning the voluntary offer of a black citizen to serve as a registrar, county officials impaired black access to the political system and the confidence of blacks in the system's openness." *Id.* 731 F.2d at 1570. The failure to conduct precinct registration or to appoint deputy registrars may also represent evidence

of a failure by defendants to act to overcome past discrimination. *See United States v. Dallas County Commission, supra,* at 1539. As the Senate Report on the amendments to the Voting Rights Act indicates, one of the positive steps which might be taken for jurisdictions seeking to bail out a Section 5 is "appointment of deputy registrars who are present at locations accessible to minority candidates...." S.Rep. 97–417 at 55, *reprinted in* 1982 U.S.Code Cong. & Ad.News at 233. The efforts of blacks to become more involved in the political process, which are frustrated by predominantly white voter registration officials, represents probative evidence of unresponsiveness by elected officials to the particularized needs of this minority group.

I. Whether the Policy Underlying the State or Political Subdivision's Use of Such Voting Qualification, Prerequisite to Voting, or Standard, Practice or Procedure Is Tenuous.

▪ 20. The court addresses each of the challenged practices or procedures individually.

### (1) Failure to Make 1984 Amendments Retroactive

The defendants argue that continued dual registration is both logical and appropriate because of the two separate jurisdictions involved—municipal and state. The proof does not support this argument, although there are ostensible reasons for the state's failure to make the 1984 amendments to the Mississippi election laws retroactive. As several circuit clerks testified, the standard registration form utilized prior to 1984 did not inquire whether a voter resided within the corporate limits of a municipality. Many voters gave mailing addresses at post offices in municipalities where they did not actually reside but at which they had their mail delivered. Thus, it would pose some difficulty, particularly

in large metropolitan areas, if the municipal clerks were required to ascertain whether voters who registered with the county registrar prior to 1984 resided within the corporate limits of a given municipality. Understandably, the burden on municipal clerks of smaller municipalities would be less difficult. Apparently, avoiding this burden on municipal clerks was the aim of the Legislature in failing to make the 1984 amendments retroactive with regard to voters who had registered with their county registrar prior to August 3, 1984, as testified by Representative Tim Ford.

In the opinion of the court, the failure to make the 1984 amendments retroactive was not rationally related to any compelling state interest, although motivated by economic and practical considerations. Mere inconvenience to the state is no justification for burdening citizens in the exercise of their protected right to register to vote.[8] Blacks and other minorities continue to face disproportionate economic and educational levels resulting from past discrimination which inhibits their political participation. *See, e.g., Rogers v. Lodge,* 458 U.S. 613, 623–626, 102 S.Ct. 3272, 3278–80, 73 L.Ed.2d 1012 (1982); *White v. Regester,* 412 U.S. 755, 768, 93 S.Ct. 2332, 2340, 37 L.Ed.2d 314 (1973); *Kirksey v. Board of Supervisors,* 554 F.2d 139, 145 (5th Cir. 1977), *cert. denied,* 434 U.S. 968, 98 S.Ct. 512, 54 L.Ed.2d 454 (1977). Their efforts to participate in the political system should not be further burdened by requiring that those who have already registered to vote must register again at another location. The court suggests that all voters who have previously registered with the circuit clerk in their county should be recognized as registered in the municipality in which they reside. Municipal clerks are certainly capable of ascertaining whether individuals reside within the corporate limits of their municipality with the assistance of the circuit clerks.[9]

---

**8.** As one court has noted, mere clerical deficiencies or burdens must give way to the voters' right to register and to vote. *Bishop v. Lomenzo,* 350 F.Supp. 576 (E.D.N.Y.1972). "The reme-

dy lies in providing more clerks rather than in registering fewer voters." *Id.* at 587.

**9.** Mrs. Lucy Carpenter, Circuit Clerk of Marshall County, and Ms. Barbara Dunn, Circuit

### (2) Failure to Deputize All Municipal Clerks

The defendants' rationale for the failure to deputize all municipal clerks is tied to the arbitrary figure of 500 population selected by the Legislature in the 1984 amendments. As Representative Ford testified, the figure of 500 was believed to be indicative of clerks who would keep regular, daily office hours and would be available to register persons to vote on a regular basis. The court finds no legitimate or compelling state interest served by the failure to deputize all municipal clerks as deputy registrars. Clearly, even small municipalities are required to conduct regular meetings. See Miss.Code Ann. §§ 21–5–13, 21–7–9 (1972); § 21–8–11 (Supp.1986). On these days the municipal clerks could make themselves available for voter registration. Similarly, those clerks who only keep part-time hours could designate certain hours and days as registration times, making themselves available for this purpose at such times. The proof indicates that in some counties those municipalities over 500 in population may be located near each other,[10] whereas the smaller municipalities are occasionally located in the remote areas of the county.[11] Deputizing all municipal clerks would significantly increase the available registration sites to those individuals living in these small municipalities which are often distant from the more populous areas of the county.

### (3) Satellite Registration

The 1984 amendments place the question of origination of satellite registration within the sole discretion of the county registrar (circuit clerk), who may request offsite registration at any time and at any location, or not at all.[12] Offsite registration may be conducted only upon the approval of the board of supervisors. The defendants assert that this discretion is necessary because these local officials are more familiar with local conditions and better able to ascertain when and where any satellite registration should be conducted. While requiring the approval of the board of supervisors might increase the likelihood that more registration sites will be selected, if both the circuit clerk and the board of supervisors have similar partisan aims in having registration at only a handful of precincts, then registration could easily be limited to those precincts. Unfettered discretion in voting registration procedures unnecessarily restricts access to the political process. See Secretary of State of Maryland v. Joseph H. Munson Co., 467 U.S. 947, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984). Additionally, the widespread variations among counties in voter registration practices, as attested to by the various circuit clerks, may result in the unequal treatment of similarly situated persons. See Frazier v. Callicutt, 383 F.Supp. 15 (N.D.Miss.1974). The court is of the opinion that a regular or normalized method of satellite registration would improve plaintiffs' access to the political process and minimize the possibility of unequal treatment of similarly situated individuals. Furthermore, the court finds no legitimate reason for failure to require polling place registration on a regular basis.[13] Prior to

---

Clerk of Hinds County, testified to a procedure which appears to be very feasible: The circuit clerks could send postcards to all county-registered voters who live in county precincts that include municipalities. The voters would be asked to identify whether they live within the corporate limits of a municipality and to return the postcard. The names of those who identify themselves as residing within a municipality would then automatically be transferred to the respective city voter registration rolls.

**10.** For example, in Simpson County the three municipalities of Mendenhall, Magee and D'Lo are located near each other along Highway 49 South. Exhibit D–24.

**11.** For example, in Tallahatchie County, the small municipality of Glendora is somewhat remote from the larger municipalities of Charleston, Webb, Sumner and Tutwiler.

**12.** As noted previously, some clerks have chosen to conduct such offsite registration on a large-scale basis, while others have done little or nothing in this regard. See supra, note 4.

**13.** This court agrees, however, with the proposition that there is no constitutional right per se to greater access to voter registration facilities. See Coalition for Sensible and Humane Solutions v. Wamser, 771 F.2d 395, 400 (8th Cir.1985). Reasonable, non-discriminatory restrictions on

1955, Mississippi law required the county registrars to spend no less than one day at each polling place during a county election year. Miss.Code Ann. § 3211 (1942). Thus, clerks are certainly capable of conducting such polling place registration.

#### (4) Failure to Deputize Volunteer Registrars

■ Plaintiffs presented substantial testimony and evidence of the circuit clerk's failure to deputize minority volunteer registrars. While this evidence is indicative of a lack of responsiveness by elected officials to minority needs, as discussed above, the court is not persuaded that unlimited deputization of minority volunteer registrars is either necessary or advisable. Rather, this is a factor, unlike the location of satellite registration sites, which in the opinion of the court may properly be left to the discretion of the circuit clerks. The circuit clerks should not be forced to deputize anyone who presents himself as a suitable deputy registrar. The clerks should be permitted some latitude in ascertaining not only whether individuals are needed as deputies but also whether those volunteering to act as deputy registrars are qualified and capable of acting as registrars. This is especially true when the clerks may be held accountable for those whom they deputize.[14] The clerks are responsible for registering all voters and must have some discretion in selecting those agents and employees who will assist the circuit clerks in accomplishing their objective.[15] The court concludes that some measure of discretion and flexibility is needed for the registration process to work smoothly and efficiently. Where necessity dictates and persons present themselves for deputization, the circuit clerks are qualified to and capable of determining which volunteers to deputize.

registration are, therefore, permissible. *Id.* at 399–400.

**14.** *See* Miss.Code Ann. § 23-15-93 (Spec.Pamph. 1986).

**15.** As is the case with satellite registration, it is even more apparent that appointment of deputy registrars at the discretion of the circuit clerk is a reasonable restriction on registration which is rationally related to the state's interest in pre-

### III. SECTION 2 VIOLATION ESTABLISHED

21. The court is of the opinion that under the "totality of the circumstances" and the "results" test mandated by amended Section 2 of the Voting Rights Act, 42 U.S.C. §§ 1973(a) and 1973(b), plaintiffs have shown a violation of the Voting Rights Act. The court need not, therefore, reach the plaintiffs' constitutional claims. *Escambia County, Fla. v. McMillan, supra.*

22. The court concludes that plaintiffs have established a Section 2 violation with regard to the following: 1) failure to make the 1984 amendments to Mississippi's election laws retroactive with regard to voters who had registered with a county registrar prior to August 3, 1984; 2) failure to mandate deputization of all municipal clerks as deputy county registrars; 3) failure to require satellite registration on a uniform statewide basis, which has resulted in minority members of the electorate having less of an opportunity to participate in the political process because of the disparate burden of the registration procedures on minorities.

23. The plaintiffs are entitled to appropriate relief from this court for the violations of the Voting Rights Act which they have established. Thus, the court sets forth below its conclusions as to the appropriate remedy for the violations proven by plaintiffs.

### IV. REMEDIES

■ 24. Plaintiffs presented scarcely any proof at trial on what the appropriate remedy should be if a violation were established.[16] The court is of the opinion that

venting fraud, maintaining qualified registrars, and promoting administrative efficiency in the registration process. *Coalition for Sensible and Humane Solutions, supra,* at 399–400.

**16.** Many of the plaintiffs' witnesses did offer their opinion that registration in "any public place where black persons congregate" would increase black registration opportunities. Additionally, plaintiffs put on Mr. Sherrod Brown, Secretary of State of Ohio, who explained the

the following remedies are appropriate at this point.

a. The court finds and concludes that the existing statutory procedures for voter registration in the Sate of Mississippi violate the compliance provisions of Section 2 of the Voting Rights Act, 42 U.S.C. § 1973(b) inasmuch as the statutes have a disparate impact on plaintiffs and all similarly situated blacks in Mississippi, which results in an abridgement of their right to vote and in their having less of an opportunity to participate in the political process and to elect candidates of their choice.

b. Since the Mississippi Legislature will be convening shortly and may address this issue at that time, no injunctive relief will be granted at this time. *Compare Iowa Socialist Party v. Slockett*, 604 F.Supp. 1391, 1398 (S.D.Iowa 1985). The court, however, retains jurisdiction over this case and hereby sets forth its opinion as to those measures that would bring the State of Mississippi into compliance with the aforesaid statutory mandate.

25. In the opinion of the court, the following procedures constitute the minimum requirements for bringing Mississippi's election laws into compliance with the Voting Rights Act:

a. Retroactivity of 1984 Amendments.

No legitimate or compelling state interest is served by the failure of the Legislature to make the 1984 amendments retroactive with regard to voters who registered with the circuit clerk in their county prior to August 3, 1984. The court suggests that a procedure be implemented whereby circuit clerks may turn over to municipal clerks copies of their entire voter rolls so that previously registered voters may be transferred to the municipal poll books. The postcard method suggested above may be the most feasible method for transferring county-registered voters onto the municipal rolls.[17]

b. Deputization of All Municipal Clerks

No legitimate or compelling state interest is served by the failure to deputize all municipal clerks, regardless of the size of their municipality or their office hours. The court suggests that all municipal clerks not heretofore deputized as county registrars be deputized by the county registrar. Clerks in municipalities of less than 500 in population or clerks who do not keep regular daily office hours should be afforded due discretion in determining appropriate hours for making themselves available to conduct voter registration.

c. Satellite Registration

No legitimate or compelling state interest is served by the failure of the state to mandate some uniform statewide method of satellite registration. The court suggests that all circuit clerks make arrangements to conduct satellite registration at no less than three voting precincts in each of the five supervisory districts [18] within their

---

many registration practices utilized by Ohio. Some of these include registration at all public high schools, "motor-voter" registration at all bureau of motor vehicle offices throughout the state, and registration at all county offices. While these expanded opportunities are certainly admirable and worthy of consideration, the court is of the opinion that to mandate these in the manner plaintiffs suggest would be an inappropriate if not impermissible exercise of this court's jurisdiction. These sweeping changes should more properly be addressed to the Mississippi Legislature. Furthermore, plaintiffs in no way suggest a need for door-to-door voting procedures, although they urge such a novel approach to voter registration.

17. Two neighboring states provide for similar mail voter registration or mail-in change-of-reg-

istration. *See* Tenn.Code Ann. § 2–2–115 (1986); Ala.Code § 17–4–134 (Cum.Supp.1986).

18. In offering this suggestion, the court takes judicial notice that Mississippi is divided into 82 counties, each of which is further broken down into five supervisory districts. D. Molpus, Secretary of State of Mississippi, *Mississippi Official and Statistical Register 1984–1988* (1985). The 82 counties range in size from 401 square miles (Alcorn County) to 922 square miles (Yazoo County), and average only 576 square miles. *Id.* The supervisory districts are proportionately smaller and the court is of the opinion that each voter should encounter no substantial difficulty in traveling to a precinct within the supervisory district in which he resides if no municipal clerk or circuit clerk registration site is nearby. Clearly, if voters are capable of traveling to

respective counties for at least one full day within 12 months of each election of state-wide officials, as set forth in Mississippi Code Annotated, § 23–15–193 (Spec.Pamph. 1986), thereby creating 15 more registration sites in each county in addition to the municipal registration sites and the circuit clerks' offices.

#### d. Disabled Voter Registration

The court suggests that provisions be made for the registration of a disabled and infirmed prospective voter who is unable to travel. Current law provides that such a disabled registered voter may vote an absentee ballot, but no similar provision exists for the registration of a disabled prospective voter. *See* Miss.Code Ann. § 23–15–629 (Spec.Pamph.1986). It is suggested that upon proper certification a deputy registrar, notary public or other designated official might call upon the prospective voter and perfect registration in a manner similar to the voting procedure now applicable to the disabled and infirmed.

26. The court realizes that these suggestions provide the state with only generalized guidelines. The court is of the opinion, however, that it would be inappropriate at this juncture for the court to dictate the manner in which Mississippi's election laws should be amended to bring them into compliance with Section 2 of the Voting Rights Act. *See Iowa Socialist Party, supra.* Considerations of comity and equity lead the court to offer the defendants an opportunity to effect their own remedial measures before the extraordinary measure of injunctive relief is imposed.

The defendants are hereby Ordered to report to this court no later than 120 days from the date hereof as to what measures have been accomplished or undertaken to bring the defendants into compliance with the opinion of this court. If new legislation is enacted, its validity may be determined judicially. In the event, however, that defendants have not undertaken appropriate remedial measures at that time,

local precincts to cast their ballots, prospective voters should have little difficulty traveling to

the court shall then consider appropriate declaratory and injunctive relief. *See McLain v. Meier,* 637 F.2d 1159, 1170 (8th Cir.1980).

one of three available registration sites within their local supervisory districts.